USM Corporation *vs.* Marson Fastener Corporation
& others.[1]

Suffolk. December 6, 1983. — June 28, 1984.

Present: Hennessey, C.J., Wilkins, Abrams, Nolan, Lynch, & O'Connor, JJ.

*Trade Secret. Unfair Competition. Damages*, Wrongful use of trade secret. *Interest. Practice, Civil*, Master.

Statement of principles guiding the determination of damages where the plaintiff in an action for misappropriation of a trade secret seeks to recover the profits realized by the defendant from its tortious conduct. [338-339]

An employee of a group of affiliated corporations who, for their benefit, misappropriated a trade secret of his former employer was not liable to the former employer in damages, where the employee was not shown to have been unjustly enriched by the misappropriation nor to be a corporate insider who might have benefited indirectly. [340]

In an action to recover the profits realized by a group of affiliated corporations and their shareholders from the misappropriation of the plaintiff's trade secret, the judge correctly allowed as deductions from gross profit only those items of selling, general, and administrative expenses which were shown by the defendants to have been incurred because of the manufacturing and sale of offending goods, and he properly concluded that the defendants were not entitled to allocate such expenses on the basis of the sales ratio between the defendants' tainted and untainted products. [340-342]

In determining monetary damages, measured by consideration of the profits realized by a group of affiliated corporations for misappropriation of the plaintiff's trade secret, the judge was warranted in finding that the selling, general, and administrative expenses of only one of the corporations were properly allocable to the offending activities. [342-343]

---

[1] The principal other defendants are Marson Corporation, various other affiliated corporations, and the three individual shareholders, directors, and officers of the Marson companies at the time this action was commenced. See *USM Corp.* v. *Marson Fastener Corp.*, 379 Mass. 90, 90 n.1 (1979). We shall refer to the Marson corporations and the defendant shareholders as the defendants or as the Marson defendants, unless otherwise indicated.

The other defendant, Frank Lahnston, is in a special category. He was an employee of the Marson group from November 4, 1963, to February, 1965, but never had an ownership interest or management position in the Marson companies.

Although of the view that income taxes paid on any profits attributable to the improper use of a trade secret should be deducted from the amount of such profits recoverable as damages by the owner of the secret, this court left undisturbed a trial judge's denial of this deduction where the data presented on appeal lacked particulars both as to the tax benefit arising from the payment of damages and as to any gain realized by the defendants through retention of the improperly earned profits until the judgment was satisfied. [343-348]

General Laws c. 231, § 6B, which provides that a tort judgment "for damage to property" shall bear interest from the date of commencement of the action, was not applicable to a judgment for monetary damages measured by the improper profit realized through misappropriation of the plaintiff's trade secret. [348-349]

General Laws c. 235, § 8, which allows prejudgment interest on the amount of monetary damages found by a master, was not applicable to a plaintiff's recovery in a trade secret action in which the master's initial findings of damages were conditional in nature and where the judge, after additional hearings, made his own findings and entered a judgment covering a time period which extended beyond that treated in the master's report. [349-350]

In the circumstances of an action to recover profits realized by the defendants from misappropriation of the plaintiff's trade secret, no principle of common law entitled the plaintiff to prejudgment interest. [350-351]

In a trade secret case there was no support for the defendants' contention that modifications made in certain machines used in their manufacturing process were derived from some source other than the plaintiff's trade secret. [351-352]

Neither G. L. c. 93, § 42, which permits a judge to award up to double the amount of all damages resulting from the tortious conversion of a trade secret, nor common law principles, permitted the addition of punitive damages where the plaintiff's recovery in a trade secret case was measured by the defendant's wrongful profits, rather than profits lost to the plaintiff. [352-354]

In an action for misappropriation of the plaintiff's trade secret there was no merit in the defendants' contention that the damage period should not extend beyond the five years which, as the master found, it would have taken to duplicate the trade secret independently, where the evidence warranted findings that the defendants used the trade secret profitably for fifteen years and that it remained a trade secret during that period. [354]

There was no merit in the contention that monetary damages for misappropriation of a trade secret and its use in the modification of machines for the defendants' manufacturing process should be limited to the period before alternative machines became commercially available, where the record did not show that the defendants could have made a profit using these alternative machines. [354]

BILL IN EQUITY filed in the Superior Court on March 8, 1965.

After review reported at 379 Mass. 90 (1979), further proceedings were heard by *Brady*, J.

The Supreme Judicial Court granted a request for direct appellate review.

*George T. Finnegan (James L. Sigel* with him) for the plaintiff.

*Harold Hestnes (David Weild, III,* of New York, with him) for Marson Fastener Corporation & others.

*James F. Ryan* for Frank Lahnston.

WILKINS, J. In *USM Corp.* v. *Marson Fastener Corp.*, 379 Mass. 90 (1979) (*USM Corp. I*), we concluded that USM Corporation (USM) had taken sufficient, reasonable steps to preserve the secrecy of trade secret information contained in a machine used in the manufacture of blind rivets so that the trade secret was entitled to protection. We remanded the case for further proceedings which appeared likely to involve (a) consideration of the master's accounting of profits as to the defendants' operations in Massachusetts from January 1, 1964, to December 31, 1972, and (b) consideration of the defendants' Massachusetts operations subsequent to the period covered by the master's report and out-of-State operations not covered by his report. *Id*. at 105 n.17.

A judge of the Superior Court modified and confirmed the master's report and, following twenty-four days of hearings in March and April, 1981, he made findings and rulings and entered an order for judgment in August, 1981. The judgment, as amended, (a) assessed liability on the Marson defendants in the approximate amount of $4,362,000, representing the corporate defendants' accountable profits from all their blind rivet manufacturing operations through December 31, 1979 (in Australia through June 30, 1980), (b) required the parties to determine accountable profits from those dates to the date of the judgment, (c) assessed punitive damages against the Marson defendants in the approximate amount of $2,181,000 (50% of the accountable profits), and (d) assessed liability in the amount of approximately $15,800 against the defendant Lahnston, based on the proportion of the accountable profits accruing

through the date on which his employment by the Marson defendants terminated in February, 1965, and assessed punitive damages against Lahnston at 50% of his liability. The judgment also enjoined all defendants, including Lahnston, from the use or communication of USM's trade secret for a period of five years.

The defendants have appealed from this judgment challenging various aspects of the determination of the accountable profits and challenging the issuance of the injunction. Lahnston by his appeal argues that, because (as the judge found) he earned no profits from the misappropriation of USM's trade secret, USM is not entitled to a money judgment against him. USM in turn has appealed challenging the judge's failure to award it prejudgment interest and attorneys' fees. USM also argues on appeal that Lahnston should be held jointly and severally liable with the Marson defendants for all the accountable profits. We allowed applications for direct appellate review. We affirm the judgment except that the award of punitive damages against all defendants and the assessment of damages against Lahnston should be struck.

The facts supporting liability can be stated briefly. The Marson defendants undertook in 1961 to manufacture blind rivets in competition with USM. Dissatisfied with the performance of their own blind rivet assembly machines, they undertook to construct an assembly machine like the USM machine using improperly obtained USM drawings and the services of Lahnston, a former USM junior engineer, who was acquainted with the USM trade secret, a unique and effective combination of features incorporated in the USM machine. The Marson defendants made use of the trade secret in manufacturing blind rivets in Massachusetts, Canada, and Australia and earned profits from the sale of blind rivets from 1965 to 1980, inclusive, as set forth in the master's report (as modified) or as found by the judge.[2] Only by use of the trade secret were the

---

[2] The following schedule, taken from USM's brief and not challenged here by the defendants, shows the defendants' annual profits, leading to

Marson defendants able to engage in the profitable manufacture and sale of blind rivets.

## GENERAL CONSIDERATIONS

Because all the issues argued on appeal concern the relief to which USM is entitled, we first set forth the general principles that guide the determination of the money judgment in favor of USM. USM has waived any damage claim based on its losses, if any, from the trade secret violation and claims instead the profits the defendants realized from their tortious conduct. See *Jet Spray Cooler, Inc.* v. *Crampton*, 377 Mass. 159, 169-170 (1979) (*Jet Spray II*). Once a plaintiff demonstrates that a defendant made a profit from the sale of products produced by improper use of a trade secret, the burden shifts to the defendant to demonstrate those costs properly to be offset against its profit and the portion of its profit attributable to factors other than the trade secret. *Id.* at 174 n.14. See 17 U.S.C. § 504(b) (1982) (copyright act). If a defendant cannot meet its burden as to costs and profits, the defendant must suffer the consequences. *Jet Spray II, supra* at 183. The

the total accountable profits:

| Year | Profits for Fiscal Periods Ending in Year |
|------|-------------------------------------------|
| 1964 | (no records) |
| 1965 | 94,784 |
| 1966 | 97,432 |
| 1967 | 186,019 |
| 1968 | 245,219 |
| 1969 | 262,681 |
| 1970 | 274,720 |
| 1971 | 260,091 |
| 1972 | 337,871 |
| 1973 | 349,345 |
| 1974 | 405,444 |
| 1975 | 493,320 |
| 1976 | 352,254 |
| 1977 | 371,231 |
| 1978 | 362,740 |
| 1979 | 174,692 |
| 1980 | 94,000 |
|      | $4,361,843 |

over-all object is to render "the ultimate recovery a sound reflection of [the defendants'] unjust enrichment due to the exploitation of the secret, and no more." See *USM Corp. I, supra* at 105 n.17; *Jet Spray II, supra* at 183 n.22. Of course, such a process may result in the plaintiff's recovering far more than its actual loss. *Id.* at 182-183.

With these principles in mind, we turn to several arguments the defendants advance, challenging the determination of the profits allocable to the use of the trade secret. The fact that the trade secret may have been, as the defendants argue, only a "minor improvement" and one made by USM at a low cost of development is irrelevant. It was this improvement alone, even if it was "minor," that, as the master and the judge warrantably found, permitted the defendants to make a profit from the manufacture of blind rivets. Although the defendants' use of the trade secret was involved in only a portion of the entire process of manufacturing and selling blind rivets, the defendants failed to prove a contribution to profits from any element other than the use of the trade secret, such as management skill or capital investment. See *USM Corp. I, supra* at 105 n.17; *Jet Spray II, supra* at 183 n.23. The availability of other machines to manufacture blind rivets without the use of the trade secret cannot aid the defendants because the use of the trade secret alone was the reason for the defendants' profitability.

The fact that use of the trade secret was the sole reason for the defendants' profitability makes it appropriate to measure USM's recovery by consideration of the defendants' profits from the manufacture and sale of blind rivets and inappropriate to consider only the value, or cost saving, to the defendants arising from the use of the trade secret. See *Jet Spray II, supra* at 172. Obviously, in some other situation, the use of a trade secret might well not be the sole source of a defendant's profits and thus the defendant's entire profits from the sale of a product manufactured by use of the trade secret would not be a just measure of the restitution owed.[3] The guiding principle is to

[3] In such a case, the defendant must show what portion of its profits was not attributable to the use of the trade secret and, in particular circumstances,

order the wrongdoing defendant to give up all gain attributable to the misuse of the trade secret and to measure that gain as accurately as possible.

## LAHNSTON'S APPEAL

The defendant Lahnston makes a straightforward, unassailable argument that, because he received no profit from the sale of blind rivets manufactured by use of USM's trade secret, he is not liable in damages. If USM were making a claim of its lost profits because of the tortious appropriation and use of its trade secret, Lahnston could well be viewed as jointly and severally liable with the other defendants. Here, however, Lahnston has not been unjustly enriched by the use of USM's trade secret. He was not a corporate insider who, with others, might be obliged to pay damages because of "their mutual enjoyment of the benefits of those secrets as stockholders, officers and directors." *Jet Spray Cooler, Inc.* v. *Crampton,* 361 Mass. 835, 844 (1972). See *Jet Spray II,* 377 Mass. at 181; *Clark* v. *Bunker,* 453 F.2d 1006, 1012 (9th Cir. 1972).[4] There is no showing that Lahnston received any gain from the misappropriation and use of USM's trade secret or that he was in a position with others to decide how to divide the spoils. Thus, although Lahnston is a tortfeasor because of his misappropriation of USM's trade secret and is, as he concedes, subject to the injunction contained in the judgment, he is not liable for money damages.

## ALLOCATION OF EXPENSES: THE INCREMENTAL COST APPROACH

Turning then to USM's recovery of monetary relief against the Marson defendants, we consider first whether the judge was

---

fairness might indicate that the plaintiff's recovery should not be measured in any respect by the defendant's profits but instead by the value, or cost saving, to the defendant of the use of the trade secret.

[4] None of the other defendants makes any claim that some or all of the Marson profits attributable to the trade secret should not be assessed against him or it.

correct, as a matter of law, in allowing as deductions from gross profit only those costs that were shown to have been incurred because of the production and sale of blind rivets. Certainly the cost of labor and materials directly related to the manufacture of blind rivets was allowable, and there is no dispute about the recognition of such items of cost in measuring the defendants' net profits. The defendants argue that selling, general, and administrative (SG&A) expenses should have been allocated on the basis of the sales ratios of tainted and untainted products. The master accepted this approach. USM argues, on the contrary, that SG&A expenses should be determined on an incremental cost approach so that only those items of SG&A expense that were increased by the production and sale of blind rivets may be deducted from gross profit. In this process all the defendants' expenses that would have been incurred if they had manufactured no blind rivets would be disregarded. This approach, which has also been called the "differential cost or marginal profit theory" (*Century Distilling Co.* v. *Continental Distilling Corp.*, 205 F.2d 140, 147 [3d Cir.], cert. denied, 346 U.S. 900 [1953]), measures the profit derived from the defendants' offending conduct. The burden is on a defendant to prove those costs that were variable and were incurred in the offending operation. *Jet Spray II, supra* at 174 n.14. The judge was correct in concluding that the defendants were not entitled to allocate their SG&A expenses on the basis of sales ratios.

Although our cases have not recognized the incremental cost approach as such, they are consistent with its use. In *Regis* v. *H.A. Jaynes & Co.*, 191 Mass. 245, 252 (1906), a trademark violation case, the defendants did not offer to show that their general expenses had been increased at all by their sale of the goods unlawfully having the plaintiff's trademark, and we denied the defendants the right to deduct the amount of any expenses not shown to be properly chargeable to the infringing goods. We followed this same approach in *MacDonald* v. *Page Co.*, 264 Mass. 199, 206-207 (1928), and in *Eno* v. *Prime Mfg. Co.*, 314 Mass. 686, 692-693 (1943). In another trademark case, the defendant's dealings in goods bearing

the plaintiff's trademark was a substantial and integral part of its business and, because we concluded that "the defendant's general expenses have been at least proportionately increased" by the manufacture and sale of the offending goods, we allowed general expenses to be apportioned on the basis of sales ratios. *C.A. Briggs Co.* v. *National Wafer Co.*, 215 Mass. 100, 110 (1913). The principle we apply is recognized in Restatement of Torts § 748 comment i (1938),[5] and was applied in *Carter Prods., Inc.* v. *Colgate-Palmolive Co.*, 214 F. Supp. 383, 403 (D. Md. 1963), and *Sheldon* v. *Metro-Goldwyn Pictures Corp.*, 106 F.2d 45, 54 (2d Cir. 1939), aff'd, 309 U.S. 390 (1940). The result of this approach is that, where proof is impossible (perhaps because of the unavailability of precise data), the offending defendant takes the consequences. See *Jet Spray, II, supra* at 174 n.14.

One other aspect of the allocation of SG&A expenses relates to the defendants' claim that the judge should have considered the combined SG&A expenses of Marson Fastener Corporation (Fastener), which only assembled rivets and manufactured rivet setting guns, and of Marson Corporation (Marson), which sold rivets purchased from Fastener and handled a variety of products. Their books were separately maintained until their merger in 1979. The judge was not required as a matter of law to disregard the expenses separately allocated and was warranted in finding, both on the evidence before him and as an ultimate conclusion on the master's subsidiary findings, that only

---

[5] This comment states in part: "Consequently the accounting for profits seeks to determine as accurately as possible what part of the joint expenses was incurred in the manufacture or marketing of the infringing goods and what part would have been incurred if the infringing goods had not been manufactured or marketed. If the manufacture and marketing of the infringing goods causes no increase in the general expense, no part of it is to be allocated to them, even though such a practice would be bad from the point of view of cost accounting or business policy." The subject of unfair competition was deleted from the Restatement (Second) of Torts (1978) because it was concluded that the law of unfair competition and trade regulation was no more dependent on tort law than on many other fields of law and because broad statutory developments, particularly at the Federal level, had become significant. See Restatement (Second) of Torts Introductory Note to Division Nine, at 1-2 (1978).

Fastener's SG&A expenses were properly allocable to the offending operation. If, in fact, any SG&A expense of Marson was incremental and attributable to the offending operation, the burden was on the defendants to prove it. To the extent that the allocation on the defendants' books of costs between Fastener and Marson was haphazard or arbitrary, the solution was not to merge all their SG&A expenses but to place on the defendants the consequences of their failure of proof. See *USM Corp. I*, 379 Mass. at 92 n.3.

## DEDUCTION OF INCOME TAXES

The defendants argue that, in determining the profits payable to USM, they should be allowed to deduct income taxes paid on any profits found to be attributed to their improper use of the trade secret.[6] In our prior opinion in this case, a minority of the court (with the majority taking no position) suggested that "allocable taxes" were properly allowable. See *USM Corp. I, supra* at 105 n.17. Because the object is to determine as precisely as possible the gain derived from the wrongful use of a trade secret and to take that gain away from the wrongdoer, an allowance of a deduction for income-based taxes seems theoretically appropriate. The goal is to determine the defendants' net profit, not its gross profit. Taxes, therefore, are as much a proper allowance against the gross profit as is any other cost obligation incurred in generating that profit.

---

[6] It appears that below the defendants claimed as a deduction not only the Federal income taxes paid on any demonstrated profits but also that portion of the corporation's corporate excise attributable to its trade secret income. The defendants have given us no indication in their brief or in the record appendix as to how the income taxes attributable to Marson's profit should be calculated. Of course, precise calculations cannot be made until the recoverable profits are determined, and, even then, the question would remain whether the taxes should be allocated among the corporations' activities on some proportional basis or whether the recoverable profits should be treated as derived from the last dollars earned in each year for which recovery was allowed. That question might be answered by the way in which the recoverable profits themselves are determined. See *Alfred Bell & Co.* v. *Catalda Fine Arts, Inc.*, 86 F. Supp. 399, 404 (S.D.N.Y. 1949), aff'd as modified, 191 F.2d 99 (2d Cir. 1951).

In spite of the apparent reasonableness of allowing a credit for income taxes paid or payable because of any trade secret profit, the great weight of authority in recent decades in Federal trademark, copyright, and patent cases is to deny a deduction for income taxes paid if the infringing or wrongdoing defendant was a wilful violator of the plaintiff's trade secret right or some other right. See *Wolfe* v. *National Lead Co.*, 272 F.2d 867, 873 (9th Cir. 1959), cert. denied, 362 U.S. 950 (1960) (trademark infringement); *Century Distilling Co.* v. *Continental Distilling Corp.*, 205 F.2d 140, 148 (3d Cir. 1953) (trademark infringement); *Alfred Bell & Co.* v. *Catalda Fine Arts, Inc.* 191 F.2d 99, 106 (2d Cir. 1951) (copyright infringement); *Sheldon* v. *Metro-Goldwyn Pictures Corp.*, 106 F.2d 45, 53 (2d Cir. 1939) (copyright infringement); *Goodyear Tire & Rubber Co.* v. *Overman Cushion Tire Co.*, 95 F.2d 978, 985 (6th Cir. 1937), dismissed on motion of counsel, 306 U.S. 665 (1939) (patent infringement). Contra *W.E. Bassett Co.* v. *Revlon, Inc.* 435 F.2d 656, 665 (2d Cir. 1970) (trademark infringement, no discussion of the issue, no authority cited).[7] The pattern of disallowing a deduction for income taxes has been substantially dictated by the Supreme Court's opinion, written by Justice Holmes, in *L.P. Larson, Jr., Co.* v. *Wm. Wrigley, Jr., Co.*, 277 U.S. 97 (1928). The Supreme Court

---

[7] If the wrongdoer is an "innocent" one or one who acted in good faith, an allowance for income taxes paid has been recognized. See *Stromberg Motor Devices Co.* v. *Zenith-Detroit Corp.*, 73 F.2d 62, 65 (2d Cir. 1934), dismissed on motion of counsel sub nom. *Zenith-Detroit Corp.* v. *Bendix Stromberg Carburetor Co.*, 294 U.S. 735 (1935) (patent infringement); *Stromberg Motor Devices Co.* v. *Detroit Trust Co.*, 44 F.2d 958, 965 (7th Cir. 1930) (patent infringement); *Alfred Bell & Co.* v. *Catalda Fine Arts, Inc.*, 86 F. Supp. 399, 404 (S.D.N.Y. 1949) (copyright infringement); *Triplex Safety Glass Co. of N. Am.* v. *Pittsburgh Plate Glass Co.*, 38 F. Supp. 639, 643 (D. Del. 1941) (patent infringement); *Hyman & Co.* v. *Velsicol Corp.*, 123 Colo. 563, 630, cert. denied, 342 U.S. 870 (1951) (patent infringement).

The distinction between innocent and intentional infringers, allowing a deduction for taxes only if paid by an innocent infringer, has not been approved in all instances. See *Schnadig Corp.* v. *Gaines Mfg. Co.*, 620 F.2d 1166, 1170-1171 (6th Cir. 1980) (denying an innocent infringer a deduction for taxes). See also *Carter Prods., Inc.* v. *Colgate-Palmolive Co.*, 214 F. Supp. 383, 406 (D. Md. 1963) (questioning the distinction).

concluded that, when a defendant is a conscious and deliberate wrongdoer and the plaintiff has to pay a tax on its recovery, it is "just that the further deduction [for taxes] should not be allowed." *Id.* at 100.[8]

The reasoning in the *Larson* opinion in support of denying a deduction of income taxes is unpersuasive. The fact that a plaintiff may be subject to income tax liability on its recovery has nothing to do with measuring a defendant's gain from its wrongdoing. We simply disagree with the statement in *Wolfe* v. *National Lead Co.*, 156 F. Supp. 883, 892 (N.D. Cal. 1957), aff'd, 272 F.2d 867 (9th Cir. 1959), cert. denied, 362 U.S. 950 (1960), allowing a deduction for State franchise taxes, that the justification for denying a deduction for income taxes is the taxability to the plaintiff of its recovery. The further fact that the defendant was a knowing and intentional tortfeasor may justify rendering judgment and resolving unanswerable damages questions against it but it cannot justify ignoring an ascertainable expense.[9] There is no sound reason for treating income taxes

---

[8] The Court undertook to distinguish taxes from other costs, commenting that "[i]t would be unjust to charge an infringer with the gross amount of his sales without allowing him for the materials and labor that were necessary to produce the things sold, but it does not follow that he should be allowed what he paid for the chance to do what he knew that he had no right to do." *L.P. Larson, Jr., Co.* v. *Wm. Wrigley, Jr., Co.*, 277 U.S. 97 (1928). The Holmesian pronouncement as to Federal law has been often accepted in the common law area. In the Restatement of Torts § 748 comment g (1938), in words taken in part directly from the *Larson* opinion, it is said that income taxes "are payments for the opportunity to make the income and it is deemed anomalous that the defendant should be allowed what he paid for the chance to do what he knew that he had no right to do." No similar provision appears in Restatement (Second) of Torts (1978). See n.5 above.

[9] A thoughtful opinion on this question was issued several years before the *Larson* opinion put a cloud on the subject. In *W.W. Sly Mfg. Co.* v. *Pangborn Corp.*, 276 F. 971, 976-977 (D. Md. 1921), aff'd, 284 F. 217 (4th Cir. 1922), cert. denied, 260 U.S. 749 (1923), Judge Rose commented: "Nevertheless, I cannot help feeling that, in view of the high taxes now levied upon business profits, it would be utterly unfair to ignore them in determining the amount of the net gain which an infringing defendant should turn over to a plaintiff . . . . [W]here the owner of the patent seeks to charge the infringer, as a trustee, with the profit made, no arbitrary rule should require him to turn over a sum greatly exceeding any profit the law has

paid as different from all the other expenses involved in generating the gain that must be extracted from a defendant. Judge Learned Hand recognized the illogic of the distinction made in the *Larson* case but thought it acceptable because the defendant was a wilful bad actor. *Sheldon* v. *Metro-Goldwyn Pictures Corp.*, 106 F.2d 45 (2d Cir. 1939), aff'd, 309 U.S. 390 (1940). "It does indeed seem somewhat arbitrary to distinguish this from other expenses necessary to the business; yet on the other hand the distinction illustrates that in dealing with a conscious wrong-doer, courts do not feel obliged for consistency's sake to take one extreme or the other." *Id.* at 53.

In a recent case, the United States Court of Appeals for the Sixth Circuit undertook to justify the denial of a deduction for income taxes in a design patent case in which the patent holder was entitled to recover the infringer's "total profit." See *Schnadig Corp.* v. *Gaines Mfg. Co.*, 620 F.2d 1166, 1169-1171 (6th Cir. 1980); 35 U.S.C. § 289 (1982). That court concluded that, because the infringer would be entitled to a tax deduction on the amounts it paid, the infringer would obtain a benefit from the allowance of that deduction, while the plaintiff would be taxable on the amount recovered. *Id.* at 1169. The Sixth Circuit opinion raised a valid point, as far as it went, because, if the amounts paid are deductible and consist of only after-tax profits, the wrongdoer will obtain a tax benefit from its improper use of the trade secret.[10] The cure, however, for the problem the Sixth Circuit opinion raises is not to disallow tax deductions but to assure that any tax benefit from the defendant's payment of after-tax profits to the plaintiff will also be taken from the defendant. This can be done by assuring that, as the tax benefit,

---

allowed him to keep for himself. Only equity can award profits, and, in equity, equity must be done. Under the facts at bar, what is equity?"

We shall return to Judge Rose's comments when we discuss the consequences of the defendants' tax benefit arising from the payment of its profits to the plaintiff. See n.11 below and accompanying text.

[10] We reject the view expressed in *Triplex Safety Glass Co. of N. Am.* v. *Pittsburgh Plate Glass Co.*, 38 F. Supp. 639, 643 (D. Del. 1941), allowing a deduction for taxes to a nonwilful infringer, that the defendant's tax benefit from paying deductible damages is of no concern to the plaintiff.

if any, of such a payment is determined, the defendant makes further payment to the plaintiff. Such a process was proposed by the court in *W.W. Sly Mfg. Co.* v. *Pangborn Corp.*, 276 F. 971, 977 (D. Md. 1921), aff'd, 284 F. 217, 220 (4th Cir. 1922), cert. denied, 260 U.S. 749 (1923), and endorsed by the United States Court of Appeals for the Third Circuit in *Macbeth-Evans Glass Co.* v. *L.E. Smith Glass Co.*, 23 F.2d 459, 463 (3d Cir. 1927).[11] Although the process of paying damages could be drawn out over several years, as each pay-ment to the plaintiff of a tax benefit derived from the payment of damages itself may generate a tax benefit, we would not reject such a resolution if a defendant presented the necessary data to support the entry of such a judgment.[12]

The defendants have made no extended argument along the lines suggested in this opinion. They ignore the great weight of authority against their position and do not attempt to distin-guish it. Record references to the impact of taxes on the defend-ants' profits do not permit the kind of analysis this opinion suggests. The defendants make no acknowledgment that any tax benefit arising from the payment of damages has to be reflected in the process of determining damages. Moreover, if one were to engage in the fine tuning of the appropriate mone-tary recovery that this opinion suggests might be done in order to measure the defendants' true gain, recognition would have to be given to the value of that gain to the defendants between the time it was earned and the time the judgment is satisfied. The defendants do not acknowledge that fact and resist any

---

[11] This latter opinion refers favorably to Judge Rose's opinion in the *Sly* case noting the logic of its reasoning, even though the allowance of a deduction for income taxes is not free from difficulty: "Also to that opinion we refer for instances of perplexing difficulties which such an allowance naturally raises; yet to the reasoning of that opinion we subscribe, for it shows the duty of courts to meet those difficulties when they can and it demonstrates the practicality of sometimes administering equity in such cases." *Macbeth-Evans Glass Co.* v. *L.E. Smith Glass Co., supra.*

[12] A similar solution was proposed in *Hyman & Co.* v. *Velsicol Corp.*, 123 Colo. 563, 630-631, cert. denied, 342 U.S. 870 (1951), where a deduction for Federal and State income taxes paid was allowed in determin-ing the infringer's profits payable to the plaintiff.

award of additional recovery because of the value to them (at least in theory) of holding their improperly earned profits over a period of years. In these circumstances, the trial judge's conclusion to deny the defendants a deduction for income taxes paid was appropriate.

### RECOVERY OF PREJUDGMENT INTEREST

In the midst of our consideration of the defendants' claims of error by the trial judge, we turn to an issue on which USM claims the judge erred — the denial to USM of prejudgment interest. We consider the interest issue at this point because its resolution is related in part to the answers just given to the questions of the disallowance of a deduction of income taxes and the allocation of expenses to offset gross profit. USM argues that the judge should have awarded prejudgment interest, relying both on statutory provisions and on common law principles.

In *Jet Spray II*, 377 Mass. at 182 n.21, a case involving recovery of the defendants' profits and the misappropriation of trade secrets, we rejected the plaintiff's claim that it was entitled to interest under G. L. c. 231, § 6B, from the date of the commencement of the action. USM urges us to reconsider that holding because, it is claimed, that holding is inconsistent with our treatment of other tort awards under § 6B.

Section 6B awards interest on a tort judgment "for damage to property" from the date of the commencement of the action, and the judgment thus undertakes in a general way to make the plaintiff whole. This trade secret case is different because the monetary award based on the defendants' profits is not designed to make the plaintiff whole and because here the defendants' monetary gain accrued after the commencement of this action (see *Jet Spray II, supra*), unlike the typical tort action where damages accrue at the time of the tortious injury. Thus we have allowed interest under § 6B on that portion of a tort award represented by the loss of earning capacity (lost future earnings discounted to present value). *Carey* v. *General Motors Corp.*, 377 Mass. 736, 746 (1979). Trade secret cases of this character are, however, significantly different from the tort cases with which § 6B is concerned, as was noted in *Jet Spray II, supra*, and in

*Charles D. Bonanno Linen Serv., Inc.* v. *McCarthy*, 550 F. Supp. 231, 247 n.2 (D. Mass. 1982), aff'd on this issue, 708 F.2d 1, 12 (1st Cir. 1983). It makes no sense, for example, for USM to receive interest under § 6B from the date of the commencement of the action in 1964 on the defendants' accountable profits in years from 1965 to 1981.[13]

USM argues that it is at least entitled to interest under G. L. c. 235, § 8, on the amount of monetary relief found by the master. Under G. L. c. 235, § 8, as appearing in St. 1983, c. 652, § 2, "[w]hen a judgment is rendered . . . upon the report of . . . [a] master," interest is to be computed on the amount of the damages found in the report from the time of the report to the time judgment is entered. The master's report recommended that judgment be entered for all the defendants on the ground that USM did not take adequate measures to protect its trade secret. He made conditional findings concerning the defendants' profits. Our earlier opinion in this case held that USM had an adequately protected trade secret. *USM Corp. I*, 379 Mass. at 103. When the judge considered the matter on remand, he modified and confirmed the master's report. He did not, however, make any finding as to the defendants' gains during the years covered by the master's report. He heard further evidence, some of it relating to the years covered by the master's report, and made his own findings as to the defendants' profits for all years for which data were then available.

We have allowed interest from the date of the filing of a master's report even though some modifications in the master's computation of damages were made. See *Jet Spray II*, 377 Mass. at 181-182; *Coyne Indus. Laundry of Schenectady, Inc.* v. *Gould*, 359 Mass. 269, 278-279 (1971); *Buckley & Scott Utils., Inc.* v. *Petroleum Heat & Power Co.*, 313 Mass. 498,

---

[13] USM argues only for interest under § 6B on the defendants' annual profits from the end of each year. Although this approach would do violence to the direction of § 6B to compute interest from the commencement of the action, it might produce a result logically consistent with § 6B because future damages in most tort actions should be discounted to the date of the commencement of the action. See *Griffin* v. *General Motors Corp.*, 380 Mass. 362, 367 (1980).

510 (1943). It may be, and we do not decide, that judgment can be fairly said to be rendered on a master's report when, after the master rules in favor of a defendant on liability but makes conditional damage findings, a court decides that there was liability and relies solely on the master's conditional damage findings in rendering judgment. Here, the judge did not render judgment on the master's report when he modified and confirmed that report and then, after further hearings on the defendants' profits and other matters, entered a judgment covering the entire damage period.

USM properly contends that, quite apart from any specific statutory direction concerning the allowance of interest, an award of prejudgment interest properly could be made by application of common law principles. See G. L. c. 107, § 3. In the process of extracting from the defendants the gain they derived from the trade secret violation, one should not ignore the fact that the defendants have had the use of the allocable profits.[14] The matter of awarding prejudgment interest is, however, one of balancing equities. *Jet Spray II*, 377 Mass. at 183-184, and cases cited. The judge expressly declined to assess blame for the delay in the resolution of this dispute. He noted and applied the standards we stated in *Jet Spray II* where we concluded that the defendants would not be unjustly enriched if they are not required to pay interest on the total profits awarded.[15] The allocable profits in this case have been enhanced

---

[14] Our concern here is not that USM was wrongfully denied the use of the money represented by the damages recovery (see *Chelsea Indus., Inc.* v. *Gaffney*, 389 Mass. 1, 17 n.22 [1983]; *Coyne Indus. Laundry of Schenectady, Inc.* v. *Gould*, 359 Mass. 269, 278 [1971]), because the monetary relief in this case is based on the defendants' gain and not on USM's losses.

[15] In *Jet Spray II, supra* at 183, we said: "Here, the plaintiffs have been awarded the entirety of the defendants' net corporate profits from 1964 to 1975. This award is made because it is impossible for the defendants to segregate the portion of their profits which is attributable to the misappropriated trade secrets from the portion of their profits which may be attributable to other factors. See, e.g., *Carter Prods., Inc.* v. *Colgate-Palmolive Co.*, 214 F. Supp. 383, 399 (D. Md. 1963). Thus it is likely that the 'plaintiff may recover more than his exact loss.' *National Merchandising Corp.* v. *Leyden*, [370 Mass. 425, 433 (1976)]" (footnotes omitted).

because the defendants were unable to produce financial data to prove their claim that certain expenses should have been deducted in determining those profits. Any award of prejudgment interest would have to be based on after-tax profits because it is only those amounts which the defendants could have used to their advantage. However, as was true as to the plaintiff in *Jet Spray II* (see 377 Mass. at 176 n.16), the allocable profits awarded to USM are the defendants' pretax profits. The judge's determination not to award prejudgment interest was proper in the circumstances.[16]

## OTHER MACHINES

The defendants argue that they used certain machines to manufacture blind rivets that did not incorporate USM's trade secret. The defendants did make certain design changes in some types of machines they used. All changes were developed by persons who had knowledge of USM's trade secret. The master found that those redesigned machines considered by him used substantially the process embodied in the USM machine. The judge considered circumstances during the years not covered by the master's report and came to the same conclusion.

Where a defendant constructs and uses a machine which is "substantially a replica of the plaintiff's machine" incorporating a protected trade secret, the plaintiff is entitled to relief. See *Junker* v. *Plummer*, 320 Mass. 76, 79 (1946). If the defendant's machine is "substantially similar" to, or in "essential conformity" with, the machine incorporating a protected trade secret, the plaintiff is entitled to relief. See *id.; Atlantic Wool Combing Co.* v. *Norfolk Mills, Inc.*, 357 F.2d 866, 868-870 (1st Cir. 1966). Modifications in the process do not relieve a defendant of responsibility if the defendant's process is substantially derived from the trade secret. See *Minnesota Mining & Mfg. Co.*

---

[16] The judge was correct in concluding that there were not special circumstances justifying the award of attorney's fees to USM. See *Fuss* v. *Fuss*, 372 Mass. 64, 70 (1977); *Harrison* v. *Textron, Inc.*, 367 Mass. 540, 554 (1975); *Chartrand* v. *Riley*, 354 Mass. 242, 243-245 (1968).

v. *Technical Tape Corp.*, 221 N.Y.S.2d 58, 60-63 (Sup. Ct. 1961), aff'd, 18 A.D.2d 679 (N.Y. 1962); *Forest Laboratories, Inc.* v. *Pillsbury Co.*, 452 F.2d 621, 625 (7th Cir. 1971); *Mycalex Corp. of Am.* v. *Pemco Corp.*, 64 F. Supp. 420, 425 (D. Md. 1946), aff'd, 159 F.2d 907 (4th Cir. 1947); Restatement of Torts § 757 comment c (1939). Where modifications in the process are made by persons cognizant of the trade secret, as here, proof of the independent derivation of the differing process is more difficult than would be the case if an apparent "modification" were made by a person untainted with knowledge of the trade secret.

The defendants have presented no basis for rejecting the judge's conclusion, on the facts before him and on the master's findings, that the modifications in certain machines were not significant and that those machines incorporated USM's trade secret, substantially although not identically. There is simply no support for the defendants' claim that the processes in their redesigned machines were derived from some source other than USM's trade secret.[17]

## PUNITIVE DAMAGES

The judge concluded that, because of the defendants' flagrant misconduct in misappropriating the trade secret, an award of punitive damages was appropriate, and he assessed exemplary damages in the amount of 50% of actual damages. He made his ruling on common law principles, apparently taking the

---

[17] We do not rely on the judge's alternative ground for finding that the defendants used USM's trade secret, namely, that the defendants' breach of commercial morality requires that doubts about the scope of the secret be resolved against the defendants. While, as noted above, a defendant has the burden of coming forward with proof of its expenses appropriately to be offset against its gross profits derived from a proved trade secret infringement, the plaintiff has an unshifting burden to prove that the defendant misappropriated and wrongfully used the plaintiff's trade secret. The law allows relief to a trade secret owner from an infringement partly to encourage commercial morality (Johnson, Remedies in Trade Secret Litigation, 72 Nw. U.L. Rev. 1004, 1005 [1978]), but the existence and scope of a defendant's infringement must be determined before the owner can be granted relief and the defendant characterized as a violator of commercial morality.

view that G. L. c. 93, § 42, inserted by St. 1967, c. 817, § 3, did not apply because it was enacted after the defendants misappropriated USM's trade secret.[18] We conclude that an award of punitive damages was not appropriate.

We have consistently maintained that punitive damages are not to be allowed in the absence of statutory authorization. See *Torres* v. *Attorney Gen.*, 391 Mass. 1, 13 (1984); *Lowell* v. *Massachusetts Bonding & Ins. Co.*, 313 Mass. 257, 269 (1943); *Boott Mills* v. *Boston & Me. R.R.*, 218 Mass. 582, 589 (1914). There is nothing inherent in the misappropriation of trade secrets, compared with other intentional torts, that would suggest a special rule in trade secret cases, and particularly so in a case in which monetary relief is measured by a defendant's profits and not by a plaintiff's losses.

USM argues that an award of punitive damages is justified pursuant to G. L. c. 93, § 42, even though it was enacted in 1967, a few years after the misappropriation of the trade secret. In *Jet Spray II,* 377 Mass. at 166 n.8, we considered a similar factual pattern but did not have to decide whether punitive damages could be awarded under G. L. c. 93, § 42. We cited cases that held that statutes changing the measure of damages after a tort had been committed were not applicable retroactively, but we also cited a case holding that a statutory change in allowable interest on judgments could be implemented prospectively from the effective date of the change. *Id.* Here, unlike many torts, the defendants' continuing conduct affected the monetary relief recoverable. Indeed, most of the defendants' allocable profits were earned after the 1967 statute became effective.

We construe G. L. c. 93, § 42, even if it should be applied at least to post-1967 damages arising from a pre-1967 tort, as inapplicable to the monetary relief recoverable in this case. That statute allows the judge to award up to double the amount of all damages resulting from the tortious conversion of a trade

---

[18] That statute provides that a person who converts a trade secret is liable in tort "for all damages resulting therefrom." It further provides that "the court, in its discretion, may increase the damages up to double the amount found."

secret. The reference to damages "resulting from" a defendant's tortious act concerns the trade secret holders' loss of profit, and not, as here, a defendant's profit at a plaintiff's expense. If § 42 had referred to the damages or monetary relief recovered, as it might have, the result might be different. We decline to give § 42, a statute imposing a penalty, an expansive interpretation.

## THE DAMAGE PERIOD

The defendants argue that the damage period is too long. They contend that it should have been cut off in 1970 (five years after the misappropriation) because, as the master found, the trade secret could have been duplicated independently in five years. Further, they argue, in any event, that the damage period should have been terminated when, in 1975, alternative machines became commercially available. This latter argument needs no extended discussion. There was no finding that the defendants could have made a profit using the machines that became alternatively available.

There is no merit to the claim that, because the trade secret could have been produced independently in five years, monetary relief should be limited to the defendants' profits from the use of the trade secret only for the first five years after the wrongful appropriation of the trade secret. Here the evidence showed the defendants' profitable use of the trade secret in each year from 1965 to 1980. The trade secret was a trade secret throughout this period and did not become lawfully known and available through legitimate procedures. The so called "head start rule" has no application here, so as to limit the damage period, at least for the reason that USM's trade secret, incorporated in the machine that made blind rivets, has never appeared in any marketed product or otherwise lawfully been made publicly accessible. See *Jet Spray II,* 377 Mass. at 171-172 n.11.[19]

---

[19] The "head start rule" would limit damages to that period of time in which "others in the trade are likely, through legitimate business procedures, to have become aware of these secrets." *Analogic Corp.* v. *Data Translation,*

INJUNCTIVE RELIEF

The injunction against the defendants was fully warranted, and it is of a reasonable duration. See *id.; Eastern Marble Prods. Corp.* v. *Roman Marble, Inc.,* 372 Mass. 835, 842-843 (1977); *Analogic Corp.* v. *Data Translation, Inc.,* 371 Mass. 643, 647-649 (1976).

CONCLUSION

The amended final judgment is modified by vacating those paragraphs assessing punitive damages (paragraphs three and five) and by vacating the paragraph imposing liability for damages on Frank Lahnston (paragraph four), and as so modified it is affirmed.

*So ordered.*

---

*Inc.,* 371 Mass. 643, 649 (1976). Once a product is marketed, competitors may legitimately study the product and learn the principles of the trade secret. *Id.*