Sweeney, Constance M., J.
On June 29, 2009, the Court issued a Memorandum of Decision finding that the Defendants JPS Elastomerics Corp. and James Galica violated General Laws, Chapter 93A, Sections 2 & 11 by willfully misappropriating the Plaintiffs UF trade secret. The court ordered the defendants to pay disgorgement damages to the plaintiff and ordered that the damages be trebled. The court also entered a preliminary injunction against the defendants in anticipation of the entry of a permanent or final injunction. Further hearings were conducted to determine the amount of the disgorgement damages, the scope of a final injunction and the reasonable attorneys fees and costs incurred by the plaintiff in prosecuting this case.
Based on the credible evidence from the first phase of the trial and the subsequent hearings, coupled with the court’s earlier rulings, I find that the plaintiff is entitled to recover from the defendants actual monetary damages of $1,075,556, punitive damages of $2,151,112, reasonable attorneys fees of 3,902,595 and reasonable costs of $1,127,944. Additionally a 5-year production injunction and a permanent use injunction will enter against the defendants.
Final judgment will enter in accordance with the findings and rulings contained herein and those contained in the July 2, 2009 decision and the subsequent modifications thereto.
DAMAGES ACTUAL DAMAGES
The plaintiff is entitled to recover the profits JPS has realized from its wrongful appropriation of STR’s trade secret. Jet Spray Cooler, Inc. v. Crompton, 377 Mass. 159, 169-70 (1979). The Supreme Judicial Court instructs us that “(t]he guiding principle is to order the wrongdoing defendant to give up all gain attributable to the misuse of the trade secret and to measure that gain as accurately as possible.” USM Corp. v. Marson Fastener Corp., 392 Mass. 334, 339-40 (1984).
The evidence during the first phase of the trial established that the defendant JPS had realized profits from its misappropriation of the plaintiffs trade secret. The court ordered the defendant JPS to account for all of its gains and expenses relating to the sales generated as a result of its wrongful use of the plaintiffs trade secret. The defendants filed an accounting with the court and the plaintiff conducted discovery relating to the veracity of that accounting. Thereafter the court held further hearings in order to determine the net profits that JPS realized from its sales of the offending products. The plaintiff proved that JPS generated at least $3,123,750 in sales from October 1, 2006 through September 20, 2009 as a result of its wrongful use of the plaintiffs trade secret.
The plaintiff bears the burden of demonstrating that JPS profited from the sale of products produced by the improper use of the trade secret. Once established, it is the defendant’s burden to demonstrate what costs should be properly offset against gross profits, as well as what portion of the profits are attributable to factors other than the misuse of the trade secret. Marson at 337. See also Data Gen’l Corp. v. Grumann Sys. Support Corp, 36 F.3d 1147, 1174 n.48 (1st Cir.1994). See Restatement (Third) of Unfair Competition §45 cmt. f (1995). “The plaintiff is entitled to recover the defendant’s net profits. The plaintiff has the burden of establishing the defendant’s sales; the defendant has the burden of establishing any portion of the sales not attributable to the trade secret and any expenses to do with it in determining net profits.”
Although the defendants eschew the plaintiffs marginal profit method in determining actual damage, the use of that method is appropriate because it properly measures the profit garnered by JPS through its improper use of the plaintiffs trade secret. Marson, at 341. As the holding in Jet Spray requires, the defendants must prove those costs that were variable and those which were incurred in the offending operation. 377 Mass. at 174 n.14.
The parties stipulated that JPS realized $3,123,750 in gross profits from sales using Method l.[1] This manufacturing method was a replication of the plaintiffs protected UF manufacturing process.
*164 The parties’ calculation and allocation of offset expenses are vastly divergent. The defendants, who bear the burden of proof of establishing proper offsets, claim offsets in the approximate amount of $3,224,534, resulting in a net loss of approximately $100,800. In contrast, the plaintiff offered evidence that the total cost to the defendant of goods sold in connection with Method One was approximately $2 million, leaving the defendant with a net profit of $1,100,000 derived from its misappropriation of the plaintiffs trade secret.
The defendants have failed to prove offsets of $3,224,534. The credible evidence establishes that, at most, the defendants are entitled to offset $2,048,194 against its gross profits of $3,123,750 from sales using Method One.[2] Accordingly, the plaintiff is entitled to recover $1,075,556 in actual monetaiy damages.
Each party offered expert testimony regarding offset expenses: William J. Piccerelli testified for the defendants and Walter Bratic testified for the plaintiff. Both gentlemen are certified public accountants and both are highly experienced and well regarded in their profession. While a review of their respective backgrounds is in order, I find that Mr. Bratic’s opinion on offsets is wholly credible based on the methodology he employed and his review and analysis of the extensive records of JPS’s manufacturing costs. This stands in marked contrast to Mr. Piccerelli’s review of unreliable cost summaries provided to him by the defendants.
Mr. Bratic holds an MBA from the Wharton School of Business. He received his certification in public accounting from the State of Texas in 1981. He worked for 20 years in the field of general accounting and was a partner in a national public accounting firm. In his accounting practice, Mr. Bratic has determined valuations of trade secrets. He has taught for many years at the University of Houston Law School focusing on the subject of the evaluation of damages, including valuation of trade secrets. Mr. Bratic has testified before state and federal courts, providing expertise on the valuation of intellectual property, including trade secrets. He has also authored numerous articles on the type of valuation at issue here.
Mr. Piccerelli is a certified public accountant in the State of Rhode Island and has practiced in that field for more than 35 years. He holds professional certification in evaluation analysis. Like Mr. Bratic, he is a member of various well-regarded professional organizations. However unlike Mr. Bratic, he has never before analyzed trade secret damages.
Mr. Bratic, due to his education and experience, is particularly adept and accurate in evaluating appropriate offset expenses incurred in the sales of goods protected by trade secrets. In keeping with his high level of expertise, Mr. Bratic reviewed all of the documents which could arguably be claimed as offset expenses, while Mr. Piccerelli based his analysis in large measure on unreliable offset summaries provided to him by the defendants.
Although the defendants bear the burden of proving offsets to gross profits, it is more helpful to first discuss the credible testimony of the plaintiffs expert, Mr. Bratic, because of its comprehensive breadth and depth, against which Mr. Piccerelli’s testimony falls short.
Mr. Bratic determined that JPS realized a net profit of $1,075,556 from its sales of products manufactured from the wrongful appropriation of the plaintiffs protected manufacturing process. Although various accounting nomenclature has been used by both parties to describe the methods of valuing offsets, Mr. Bratic’s analysis comports with the incremental cost analysis approved by the Supreme Judicial Court. Namely, while the defendants are entitled to deduct expenses chargeable to the infringing goods, they may not deduct costs that are not properly attributed to the profits realized from the sales of the offending end-product. Marson, 392 Mass. at 341-42.
Mr. Bratic, in accordance with the legal standard and accepted principles of accounting, conducted a careful examination and analysis of the offset costs. His review encompassed the time period beginning with JPS’s manufacture of the infringing product and ending with the date of the preliminary injunction which bars JPS from producing the infringing product. He examined the cost of materials, labor and overhead directly attributable to JPS’s sales of the offending product. He divided his examination into per annum quarters for the time period in question and determined the actual offset costs for each quarter. Mr. Bratic reviewed each of the REDACTED work orders associated with the offending product. He verified the contents of each work order by actually examining the underlying invoices, the prices of which are reflected in the work orders. In fact his analysis was so precise that he discovered and credited JPS with certain costs of material that its controller overlooked.
The defendant claims an offset of $2,727,023 for materials. The defendant relies for its proof on summaries computed by JPS’s company controller, Anthony Burns. In contrast, Mr. Bratic calculated the actual cost of goods sold attributable to the sales of the infringing product. His labor-intensive and accurate analysis reveals that JPS expended $1,656,453 for materials in connection with the actual sales of the offending product.
The defendants assign $275,072 as an offset for the cost of services rendered by the defendant’s employees, not including Mr. Galica and Ms. Parent. Mr. Bratic’s review of the defendants’ supporting documents reveals that the cost of services rendered by the employees associated with the actual sales of the infringing product total $242,345. The defendants also assign a temporary service labor offset of $94,868. The claimed offset is illegitimate for two reasons: 1. *165 the defendants have not provided documentation to support the claimed offset; 2. the defendants’ claimed temporary service labor expenses relate to finished goods inventory rather than to the actual sale of goods.
Mr. Bratic’s actual cost of goods sold analysis reveals that the variable manufacturing expenses total $144,641 rather than the $166,570 claimed by the defendants. The defendants’ claimed offset of $644,533 for raw materials and ending inventory is also flawed because it is not connected to the actual cost of goods sold. Obviously, ending inventory reflects goods on hand, not goods sold.
The defendants claim offsets of more than $2 million for particular line equipment known as the REDACTED line, which was specifically built to produce the infringing product. The preliminary injunction issued just before the REDACTED line became operational. Installation of the REDACTED line resulted in JPS incurring additional costs to retrofit a portion of the manufacturing plant to accommodate the new line.[3] The cost of the REDACTED line is not a legally recognizable offset against gross profits. The defendants are only entitled to offset the actual costs incurred in obtaining profits from the sales of the offending product. The REDACTED line was never operational and thus none of the sales of the offending product were realized as a result of the cost of that line. Indeed it offends commercial decency for the defendants to argue that the plaintiff should effectively bear the burden of paying for costs incurred by JPS because the entry of the preliminary injunction thwarted JPS from further exploiting its misappropriation of the plaintiffs trade secret.
The defendants failed to prove that the cost of modifications to existing lines actually resulted in the sales of the offending product. Despite having an opportunity to do so, the defendants failed to produce credible evidence, including documentation, on this particular offset claim. Instead the defendants have chosen to provide the court with a lump sum equipment offset cost of $2.5 million, attributing more than $2 million of that amount to the REDACTED line and providing the court with only a general explanation of the costs representing the difference between the REDACTED costs and expenditure for other lines. Without some reasonably precise evidence on this point, the court would simply be guessing whether the differential costs were incurred for equipment actually used in the production and sale of the offending product or for equipment that was used for experimental purposes.
The credible evidence in this case reveals that JPS made changes to line equipment in an attempt to manufacture the offending product through what is called Methods 4 & 5. The attempts to replicate the offending product through these methods were unsuccessful and did not result in sales of the infringing product. The infringing product that was actually sold was manufactured on an existing line that was refitted in order to produce the infringing product. The defendants have failed to prove any offset costs specifically relating to adjustments to the existing line. In fact, the defendants did not offer any documentation during the hearing to support the cost of any line adjustment for the infringing products that were actually manufactured and sold.
The defendants seek a deduction of $37,465 for the cost of equipment relocation necessitated by the installation of the REDACTED line. Mr. Burns testified that in order to accommodate the installation of the REDACTED line, JPS incurred costs in relocating existing equipment, reconfiguring and refurbishing utilities and making structural changes to part of the plant’s walls and ceilings. His testimony confirmed that these costs were unrelated to Method 1, the only method that resulted in sales of the infringing product. Thus, the claimed offset of $37,465 is not attributable to the sales of the infringing product.
The defendants’ claim of an offset of $40,814 for a REDACTED Safety Storage Room is unsupported by the evidence. The room in question is actually a self-standing building that was constructed off-site and installed at the JPS’s facility in order to store REDACTED required for use once Method 1 manufacture began on the REDACTED line. As we know, the REDACTED line has never been used. In fact, the storage unit was only delivered to the plant in May 2009; the sales of the infringing product occurred between Jan-uaiy 2008 and June 2009. Currently, JPS only uses the storage room for products not associated with the infringing product. The defendants have failed to prove that they are entitled to an offset of $40,814 for the storage unit.
The defendants claim additional offsets totaling $605,555. These claimed offsets fall into six categories:
Travel Expenses $27,344
Mise. Expenses $21,797
Warehousing/Handling $85,490
Had. Waste Disposal $49,416
Freight on Samples $9,781
Galica & Parent Salaries $411,727
Except for $4,755 in travel expenses, the defendants have failed to prove that the remainder of the $605,555 of claimed offsets were incurred as the result of the sales of the infringing product.
The defendants claim $27,344 in deductions for travel and entertainment incurred by Messrs. Galica and Tutterow. Both men were vague in identifying the particular travel and entertaining events related to the actual sales of the offending product. The defendants did not offer any supporting documentation to support or justify Mr. Tutterow’s expense claim of $6,705. In fact his expense reports were devoid of detail. Only *166 $4,755 of Mr. Galica’s claimed expenses are reasonably attributable to sales of the offending products.
During the liability portion of the trial, Mr. Galica testified that he attended numerous conferences in order to promote the company’s products which in-cludeTPU, the primary product manufactured by JPS. By now it should be clear that the court assigns very little credibility to Mr. Galica’s testimony. As detailed in the original Memorandum of Decision, I found that Mr. Galica would say almost anything under oath, as long as it was to his benefit. His vague and self-serving testimony during this phase of the trial has not changed the court’s view regarding his credibility or lack thereof. The only documentation that in any way supports Mr. Galica’s travel and entertainment expenses attributable to the sale of the infringing product total $4,775.
The $21,797 miscellaneous expense offset claimed by the defendants relates to what Mr. Bums testified are “things” purchased for Mr. Galica’s laboratory use in developing the formulation for Method 1 materials. However, Mr. Galica testified during the first phase of the trial that his laboratory formulation work was not method-specific. Of course during that phase of the trial it benefited the defendants to disavow that Mr. Galica’s laboratory formulation work related to the misappropriation of the plaintiffs trade secret; now the defendants ask the court to believe that the laboratory work in fact related to the manufacture of the infringing product. Suffice it to say, the defendants have failed to meet their burden of proving that the miscellaneous expense offset related to the sales of the infringing product.
The defendants seek to offset $84,490 in warehousing and handling costs. The defendants have not offered any credible evidence that the warehousing and handling of finished goods were associated in any way with the sales of the offending product. It is clear from Mr. Bratic’s testimony that a significant portion of the finished goods that were warehoused were never sold. The defendants have not offered any evidence of allocation between the warehousing of finished goods that were ultimately sold and those that were not. The defendants have not met their burden of proof on this claimed offset.
The same analysis holds true with respect to the claimed offset of $49,416 in hazardous waste disposal. Again there is a failure of proof. Similarly, the defendants’ claim of a $9,781 deduction for the cost of freight for shipping samples to potential customers fails for lack of proof because the defendants have not allocated the costs between samples that resulted in sales of the infringing product and samples that did not result in sales.
The defendants initially claimed an offset of $411,727 for the entire salaries of Mr. Galica and Ms. Parent from October 2006 through June 2009. During the final hearing, the defendants reduced the claimed offset by 15%. This claimed offset can be dismissed in short order. Mr. Galica is the Vice President of Marketing and Product Development for JPS. During the first phase of the trial, he and Mr. Tutterow took great pains to describe in detail Mr. Galica’s myriad corporate responsibilities, many of them having little or nothing to do with developing low-shrink EVA.
Mr. Galica’s testimony during the most recent hearing directly contradicted his testimony during the first phase of the trial. In 2010, he testified that he was deeply involved in developing printing applications for the TPU product, as well as promoting TPU to JPS’s customer base. Of course at the time of that testimony it was in the defendants’ interest to disassociate Mr. Galica from the acquisition of the low-shrink EVA manufacturing process in order not to implicate him and the defendant company in the theft of the plaintiffs trade secret.
Mr. Galica also testified during the first phase of the trial about Ms. Parent’s many duties at JPS which include purchasing responsibilities, plant management and quality assurance oversight of all products manufactured by JPS. Now the defendants ask the court to believe that Ms. Parent’s duties had virtually nothing to do with the general operation of the plant and everything to do with the sales of the infringing product.
As stated in the original Memorandum of Decision, the defendants equate truth with convenience not with integrity. Nothing has changed. The defendants have failed to provide any credible evidence from which the court can make a reasoned judgment as to what if any portion of Mr. Galica’s salary or Ms. Parent’s salary should be allocated as an offset to the sales of the infringing product.
It’s helpful to understand that Mr. Piccerelli, the defendants’ offset valuation expert, was significantly hampered in his analysis by the constraints of his agreement with JPS. Mr. Bums provided Mr. Piccerelli with summaries of what the defendants represented were the actual costs associated with the sales of the infringing product. Moreover, Mr. Piccerelli used an expansive methodology to determine offsets against costs of goods sold. He included all expenses incurred by JPS in the production of the infringing goods, regardless of whether or not the goods were actually sold. Using general accounting principles, rather than an analysis appropriate in determining offset expenses in trade secret misappropriation cases, he determined that any cost associated with the production of the infringing product should be deducted from gross profits regardless of sales because even though the product could no longer be sold, the expenses were still directly associated with the product.
At yet another point in his testimony, he revealed that his analysis included the accounting principle of asset impairment which recognizes that an asset may be charged off rather than depreciated once it has lost *167 its value. Since the injunction prohibited further sales of the infringing products, Mr. Piccerelli concluded that the remaining inventory should be offset against gross profits since the inventory was rendered valueless by the court’s order. This may be an accepted accounting principle for corporate valuation, profit/loss statements, tax liability and the like, but it does not have a place in determining offsets to gross profits realized from the intentional misappropriation of a trade secret.
For the foregoing reasons, I find the plaintiff has proven that JPS realized gross profits of $3,123,750. The defendants have proven that JPS incurred $2,028,194 in actual costs of sales of the infringing product. The plaintiff is awarded the net balance in the amount of $1,075,556 for the actual monetary damages it sustained as a result of the defendants’ wrongful conduct.
PUNITIVE DAMAGES
The court ruled in its original Memorandum of Decision that the defendants’ conduct in deliberately misappropriating the plaintiffs trade secret was pernicious and warranted an award to the plaintiff of three times the actual monetary damages it sustained as a result of the defendants’ wrongful conduct. The defendants, represented by new counsel, now attempt to relitigate the scope of damages and, to a certain extent the case as a whole. The court will not indulge them in these efforts.
As discussed in the original decision, the measure of damages for misappropriation of trade secrets “entitles a plaintiff to recover full compensation for his lost profits and requires the defendant to surrender the profits which he realized from his tortious conduct.” Jet Spray Cooler, Inc. v. Crompton, 377 Mass. 159, 169-70 (1979). The disgorgement of profits method for calculating damages serves two purposes: it prohibits competitors from profiting from their deliberately tortious conduct while allowing those who have been injured by such wrongful conduct to “receive adequate compensation for the loss or injury they have suffered.” Jet Spray Cooler, Inc. v. Crompton, 377 Mass. at 170.
Here, the defendant JPS realized a significant net profit from selling a product manufactured through a process it and the defendant Galica stole from the plaintiff. Just as the trade secret manufacturing process belongs to the plaintiff, so do the net profits realized from the sale of goods produced by that protected manufacturing process.
This court is firm in its determination that treble damages should be awarded to the plaintiff because the conduct of the defendants in stealing the plaintiffs protected manufacturing process is so reprehensible that for it to go unpunished would undermine the most basic principles of commercial integrity. Each defen- ■ dant is as culpable as the other. While the defendant Galica instigated this sorry saga, the defendant JPS willingly agreed to hire Galica in order to obtain his knowledge of the protected trade secret and wrongfully exploit it for JPS’s commercial benefit. The two defendants essentially conspired with one another in order to gain benefits from the wrongful use of the plaintiffs protected manufacturing process. JPS obtained entry into the low-shrink solar encapsulant market and derived profits therefrom while Galica was rewarded with a generous salary and a position of authority within the defendant company.
The Supreme Judicial Court in PMP Assocs., Inc. v. Sperry & Hutchinson Co., 366 Mass. 593, 596 (1975), set forth the test to determine whether a trade practice is unfair. The Court instructs that a trial court should examine whether the practice complained of falls within the penumbra of some common law, statutory or other established concept of fairness; whether such practice is immoral, unethical, oppressive or unscrupulous; and whether the practice causes substantial injury to competitors, other business persons or consumers. See also, Linkage Corp. v. Trustees of Boston Univ., 425 Mass. 1, 27 (1997).
Here, the defendants’ theft of the plaintiffs trade secret is blatantly unfair. Their wrongful and intentional misappropriation of the plaintiffs trade secret is unlawful and offends society’s most basic concepts of commercial fairness, giving generous leeway for the rough-and-tumble competition necessary to maintain the robust health of an open and free competitive market. The defendants’ wrongful conduct, as cata-logued in the original Memorandum of Decision, epitomizes immoral, unethical, oppressive and unscrupulous commercial practices. Their conduct caused substantial injury to the plaintiff. The defendants’ wrongful conduct demonstrates a willful violation of G.L.c. 93A, §2 and is of such gravity that it warrants an award to the plaintiff of treble damages.
ATTORNEYS FEES AND COSTS
The plaintiff is entitled to recover its reasonable attorneys fees and costs incurred in the successful prosecution of its 93A claim. G.L.c. 93A, §11 provides for the award of reasonable attorneys fees and costs wherever there has been a violation of §2. See Commonwealth v. Fall River Motor Sales, Inc., 409 Mass. 302 (1991) (entire tenure of statute is to award attorneys fees and costs to party who succeeds in demonstrating that defendant has violated §2).
The plaintiff seeks reimbursement of $4,013,495 in attorneys fees and $1,371,867 in costs. For the reasons stated herein, the court awards the plaintiff $3,902,595 in attorneys fees and $1,127,944 in costs.
1. Calculation of Attorneys Fees
“The amount of reasonable attorneys fees, awarded on the basis of statutoiy authority ... is largely discretionary with the judge, who is in the best position to determine how much time was reasonably spent on *168 a case, and the fair value of the attorney’s services.” Fontaine v. Ebtec Corp., 415 Mass. 309, 324 (1993). Reasonable legal fees are ordinarily determined by the lodestar method of computation, which requires multiplying the total number of hours reasonably spent preparing and litigating a case by the fair market rate. Id. at 326. See also Grendel’s Den, Inc. v. Larkin, 749 F.2d 945, 950 (1st Cir. 1984). In determining reasonableness of the fees, the court considers several factors. Those factors include: the difficulty of the legal and factual issues, the nature of the case and the issues presented, the time and labor required, the amount of damages involved, the results obtained, the experience, reputation and ability of the attorneys, the usual price charge for similar services by other attorneys in the same area, and the amount of awards in similar cases. Linthicum v. Archambault, 379 Mass. 809, 381, 388-89 (1979); see also Heller v. Silverbranch Construction Corp., 376 Mass. 621, 629 (1978). The burden of proving the reasonableness of the attorneys fees incurred rests with the party seeking payment of those fees. See Snow v. Mikenas, 373 Mass. 809, 812 (1977) (party claiming attorneys fees bears “both the burden of going forward with evidence and the burden of persuasion on the issue of the reasonableness of attorneys fees”). The reasonableness of the fee is a question left to the sound discretion of the judge, who is in the best position to determine how much time was reasonably spent on the case and the fair market value of the attorney’s services. Berman v. Linnane, 434 Mass. 301, 303 (2001).
The Linthicum factors are considerations the court employs in determining the reasonableness of fees; they are not legal presumptions, as the defendants contend. No one factor is determinative and while the appellate courts remind us that a factor-by-factor analysis is helpful it is not required. Ross v. Continental Resources, Inc., 73 Mass.App.Ct. 497 (2009).
Applying the Linthicum factors to this case, the credible evidence, coupled with the court’s own knowledge of the intricacies and complexities of the Plaintiffs 93A claim, reveal the following:
2. Reasonableness of the Hours Expended and Rates Charged in Light of the Complexity of Legal and Factual Issues
Plaintiffs counsel have provided comprehensive and detailed billing records which are accompanied by accurate summaries of the underlying data. The Plaintiff was represented throughout the case by a team of attorneys drawn from three separate law firms. This was not a matter of triple-teaming, rather each firm and the attorneys involved shouldered discrete responsibilities.
Weil, Gotshal & Manges: The plaintiffs lead trial firm is Weil, Gotshal & Manges, LLP (WGM). It is headquartered in Manhattan and has numerous offices worldwide, including in Boston. Atty. Bruce S. Meyer, a WGM partner, is lead trial counsel. He has been with the firm for more than 25 years, specializing in complex commercial litigation involving a wide variety of industries. Mr. Meyer has extensive trial experience, having successfully tried numerous cases in jurisdictions throughout the country. His particular area of specialty includes intellectual property, trade secrets, media, sports and advertising law. Atty. Patrick J. O’Toole, Jr. is counsel in WGM’s Boston office. He specializes in complex commercial and criminal litigation. In addition to extensive litigation experience in intellectual property law, Atty. O’Toole served as a law clerk to the Hon. Neil L. Lynch of the Supreme Judicial Court of Massachusetts and the Hon. Francis J. Boyle of the U.S. District Court for the District of Rhode Island. He also served as a Special Assistant District Attorney in Norfolk County. Attorneys Meyer and O’Toole were assisted throughout the case by Atty. Malick Ghachem, a highly skilled senior associate from WGM. Four WGM junior associates and several paralegals were intermittently assigned to review documents and conduct research.
Murtha Cullina, LLP: Atly. Everett E. Newton is Of Counsel to the Connecticut law firm of Murtha Cullina, LLP (Murtha). Murtha has long represented the interests of STR. Mr. Newton was part of the plaintiffs trial team due to both his impressive legal background and his engineering experience. He has deep appellate experience in the federal and state appellate courts where he has represented numerous clients involved in intellectual property and contract disputes. Moreover, he has a degree in engineering augmented with 18 years of experience as an engineer for United Technologies Pratt and Whitney, Mr. Newton added an important dimension to the plaintiffs successful prosecution of its 93A claim.
Fierst, Pucci & Kane: Atty. John Pucci, from the Northampton Massachusetts law firm of Fierst, Pucci & Kane, LLP (Fierst), is a respected and skilled trial lawyer. He is a partner at Fierst where he specializes in business litigation, as well as criminal defense work. Before entering private practice, he was a distinguished Assistant United States Attorney in federal districts in Pennsylvania and Massachusetts.
During the 3 1 /2-year course of this litigation, Mr. Meyer’s hourly rate ranged from $850-$885; Mr. O’Toole’s hourly rate ranged from $560-$700 per hour; Mr. Ghachem’s hourly rate ranged from $530-$665; WGM’s other associates rates ranged from $350-$415 and hourly rates of WGM’s paralegals ranged from $105-$200. Mr. Newton charged $365-$370 per hour while Mr. Pucci charged between $210-$250 per hour.
All told, the plaintiffs attorneys and paralegals provided 11,257 hours of professional legal services directly related to this trade secret dispute. As mentioned earlier, each of those hours is accounted for in the billing and work records provided by the plaintiff and the summaries of that data are included in sworn *169 affidavits. The plaintiff, through WGM, has reduced the hours for which it seeks reimbursement by 750 hours, lowering the total hours claimed to 8,250.
Although the defendants claim the amount of hours and most of the hourly rates charged by plaintiffs counsel were excessive, each party was content to rest on its oral and written arguments rather than call witnesses during the hearing on attorneys fees.
The hourly rates of plaintiffs counsel are reasonable, as are the rates of the paraprofessionals. The professional portfolios of plaintiffs counsel evidence remarkably excellent and unique levels of learning and skill and particularly high levels of specialized experience in intellectual property and trade secret law. The court was fortunate to witness such a high degree of legal professionalism throughout the course of this case. The legal and factual issues in this case were extremely complex and nuanced. Even the most cursory reading of the discovery, the pleadings and transcripts, as well as the findings and rulings by the court reveals the seriousness of this matter and the strata of preparation, analysis and presentation attendant on its resolution.
The defendants, who were represented at trial by approximately 8 lawyers from one of the nation’s largest law firms, now claim through new counsel, that “this case does not include complex or novel issues requiring the services of attorneys with a national litigation practice.” Labeling many of the plaintiffs claims as “garden-variety common-law claims,” current defense counsel, who hails from Boston, states: “If anything, the Chapter 93A claim . . . cries out for the engagement of purely local lead counsel.”
The defendants contend that the court is required to cap hourly rates at approximately $300 in order to reflect what it claims are prevailing hourly rates in the local community which the defendants define as Western Massachusetts. According to the defendants, the court cannot allow rates higher than those charged by lawyers in Western Massachusetts unless the plaintiff shows that no attorneys in the local community could have handled this matter. Needless to say, the defendant does not cite any Massachusetts legal authority in support of this proposition, probably because there is none.
The defendants contend that the fees charged by plaintiffs counsel extend well beyond their handling of the 93A claim and thus the fees must be substantially reduced. Using that as a launching pad, the defendants essentially state that all 93A claims present more or less the same challenges and thus reasonably experienced local attorneys are adequately suited to handle such claims. Thus, according to the defendants, the prevailing rates of local counsel should govern the award of attorneys fees.
As any marginally informed lawyer knows, many 93A claims rest on the simplest and most straightforward facts and legal precedent while others involve highly disputed evidence and complex legal analysis. The case at bar falls into the latter category.
This case involves the application of G.L.c. 93A, §§2 & 11 to trade secrets. I am well aware of the frequency, or more appropriately stated, the infrequency of 93A trade secret claims and trials in Western Massachusetts. From 25 years on the Superior Court bench, being based in Western Massachusetts but having presided over trials in every county in the Commonwealth, I am generous in stating that Chapter 93A trade secret cases of this complexity are a rarity in Western Massachusetts. Referencing that same experience, I can state with confidence that some members of the Western Massachusetts bar would be able to adequately litigate this case provided they first had the opportunity to gain experience in litigating cases involving the interface of 93A with the law of trade secrets.
Atty. John J. Egan and Atty. Edward D. Ethridge submitted affidavits to support the defendants’ position that local hourly rates should govern the award of attorneys fees in this case. Both gentlemen are highly experienced, skilled and successful trial attorneys. I have great respect for each of them.
Atty. Egan has represented parties in some of the most complex civil cases tried in recent times in this Commonwealth, including representing the plaintiff in Fontaine v. Ebtec, supra, which remains the seminal case in Massachusetts on the issue of the award of attorneys fees. While I share his confidence in the excellence of the Western Massachusetts civil trial bar, I note that in his affidavit he does not detail why he believes that local attorneys are equipped by experience to handle trade secret cases such as the one presently before the court. Instead, he seems to fold trade secret cases into the rubric of complex commercial litigation. He also states that the approximately 500 hours plaintiffs counsel spent in researching Chapter 93A would have been reduced by 90% had local counsel handled the case instead. As the trial judge in this case, I state with certainty that any attorney who spent only 50 hours schooling themselves on the interplay between Chapter 93A and the allegations of trade secret misappropriation particular to this case, would have failed the client.
Atty. Ethridge’s affidavit is more restrained than Atty. Egan’s. He states that he only reviewed the complaint and answer in the case. Although his practice focuses on business litigation, Atty. Ethridge candidly states that he would not have accepted the case for representation because his practice does not involve trade secrets or intellectual properly law. He states that he would have referred the case to Mr. Pucci, who he believes could have ably handled the lead counsel role for the plaintiff. He does not provide any further information to support his conclusions.
*170 The plaintiff submitted the affidavit of Atty. Daniel J. Gleason, a partner in the law firm of Nutter McC-lennen & Fish, a firm of 150 lawyers located in Boston. Like Mr. Egan, Mr. Gleason has a long and illustrious history as a civil trial lawyer in the Commonwealth. He has successfully represented clients in all types of complex civil litigation cases, including trade secrets, patent, copyright and trademark law. He managed the litigation department in his firm for many years before joining the firm’s executive committee. In these roles, he has reviewed, proposed and approved billing rates and adjustments thereto for attorneys and paralegals in his firm. He frequently serves as an arbitrator in cases where the results require fee shifting. As a result, he often reviews and awards fees to prevailing parties.
Atty. Gleason performed a comprehensive review of the billing records of plaintiffs counsel and analyzed the reasonableness of the hourly rates claimed. In performing his investigation and analysis, Mr. Gleason interviewed some of the plaintiffs attorneys in order to determine the approaches plaintiffs counsel took to staffing the case, assigning and monitoring the work and the strategies utilized in preparing and presenting the case. He also reviewed significant portions of the discovery in the case, as well as many of the critical pleadings and orders. It is clear from Mr. Gleason’s affidavit that he understands the substantial threat posed to the economic viability of plaintiff s business if it did not succeed in proving the misappropriation of its trade secret. Atiy. Gleason also recognized the complexities faced by plaintiffs counsel in preparing and presenting a factually and legally detailed and nuanced case and doing it within a tight time frame in order to contain continuing economic harm to the plaintiff caused by the defendants’ conduct.
Atty. Gleason confirms that Mr. Meyer assigned specific responsibilities to members of the plaintiffs trial team in order to contain the cost of the litigation while still ensuring that the client received thorough representation. Mr. Meyer and Mr. OToole bore primary responsibility for the actual trial of the case. Mr. OToole oversaw most of the discovery, except for expert discovery which was handled by Mr. Newton who is the most knowledgeable on the technical aspects of the case. Mr. Pucci provided the trial team with valuable advice on local practices in Western Massachusetts.
Mr. Gleason also confirms that WGM’s hourly rates are reasonable for cases of this complexity and are in keeping with the hourly rates charged by lawyers of comparable expertise in Boston.
The plaintiff has proven through credible evidence that the hourly rates charged by its attorneys are reasonable and the work that the attorneys performed was reasonable and necessary in order to prosecute the plaintiffs claims. However, the defendants correctly point out that some of the billable hours relate to appellate work and thus should be excluded from any award of attorneys fees by this court. The defendants also contend that the court should substantially discount the amount of attorneys fees because the common-law claims were tried to a jury who determined that the UF process was a trade secret but that the defendants did not misappropriate it.
While the time the plaintiffs lawyers spent on jury impanelment, charge preparation and charge conference should not be included in the award of attorneys fees, the defendants do not earn any additional discount because the jury found that the defendants did not misappropriate the trade secret. The court, in deciding the 93A claim, found that the defendants misappropriated the plaintiffs trade secret. In this particular case, the court’s judgment was informed by the very same evidence that the jury heard. Because of the complexity of the evidence, streamlining the presentation of the evidence for purposes of a bench trial would have hampered the court in arriving at its determinations of facts in the 93A claim. In other words, I needed to hear everything the jury heard in order to make my decision.
3. Results Obtained
This was a hard fought case. Each party was represented by excellent lawyers. The attorneys for each of the parties thoroughly prepared the case and masterfully tried it. The evidence was complex, technical and often times subtle. The law was challenging.
The plaintiff prevailed on its 93A claim. The plaintiff proved to the court that its UF process was a trade secret and that the defendants intentionally misappropriated it for their benefit. The court has awarded the plaintiff actual monetary damages of $1,075,556 and has trebled that award as a result of the defendants’ egregious and willful violation of G.L. 93A, §§2 & 11. Moreover, the defendants are permanently enjoined from using the plaintiffs trade secret and are barred from manufacturing and selling low-shrink EVA for a period of five years.
This is, as Atty. Gleason attests, an extraordinarily favorable result for the plaintiff.
4. Attorneys Fees—Amount Awarded
The court awards the plaintiff $3,902,595 in attorneys fees. The plaintiff requested an award of $4,013,495. However, the requested amount includes approximately $45,000 in attorneys fees for the time plaintiffs counsel spent on matters solely related to the juiy. The court has analyzed the billing records of plaintiffs counsel in determining this deduction. The court has not included in its award $65,900 in billable hours spent by plaintiffs counsel on work related to the defendants’ interlocutory appeal attempts. The appellate work undertaken by plaintiffs counsel totals approximately 94.5 hours of which 65 hours are attributable to Atty. Ghachem at the hourly rate of $665; 14 hours which are attributable to Atty. Meyers at the *171 hourly rate of $885; 14 hours which are attributable to Atty. O’Toole at the hourly rate of $700 and 1.3 hours which are attributable to Atty. Newton at the hourly rate of $370.
5. Costs
The award of costs in connection with a 93A award application is a matter of discretion for the court. Berman v. Linnane, 434 Mass. 301, 303 (2001); Creed v. Apog, 377 Mass. 522, 525 (1979). Such costs may be awarded where they are reasonably and necessarily incurred. Waldman v. American Honda Motor Co., 31 Mass.App.Ct. 451, 457 (1991).
The plaintiff seeks an award of costs in the approximate amount of $1,375,000. That amount represents:
1. Expenses incurred by WGM—$398,929.
2. Expert fees of Exponent, Inc.—$785,586 and direct costs of $59,142.
3. Expert fees of Overmont Consulting, LLC— $97,613 and direct costs of $3,663.
4. Expert fees of Atty. Daniel Gleason—$26,964 and direct costs of $95.
Over a thousand pages of billing records with accompanying affidavits and memoranda were submitted by the plaintiff in support of its request. As mentioned earlier, most of the billing records are accompanied by summaries of their content.[4] After examining the expense records of WGM I decline to award the plaintiff WGM’s expenses for document duplication, electronic research, electronic document databases, postage, library and research, telephone and teleconference, facsimile and document processing. These expenses, which total approximately $244,048, represent overhead expenses that are ordinarily factored into an attorney’s hourly rate. I do not doubt that the plaintiff and its attorneys reached an agreement wherein the plaintiff paid WGM for these expenses, but fee agreements between lawyers and clients do not affect my position on overhead costs. The remainder of the expenses attributable to WGM are discrete expenses that do not fall within the ambit of overhead. They constitute reasonable and necessary expenses incurred in the litigation of this case and include travel and meals, court reporting, depositions and transcripts, leased equipment, consultants, messenger services and special order supplies.
I award the plaintiff its costs in the amount of $844,728 for the services of Exponent, Inc. These particular expenses were incurred in connection with Dr. Maureen Reitman’s work and that of her staff in reaching the conclusion that STR’s UF process was a trade secret within the photovoltaic industry and that JPS essentially replicated that trade secret in order to manufacture low-shrink EVA. The work of Dr. Reitman and her staff was essential to the plaintiff successfully proving its 93A claim.
The Exponent team assigned to this case performed daunting scientific research and testing which led to Dr. Reitman’s opinion in this case. That team consisted of numerous scientists and engineers, many with doctoral degrees. The original Memorandum of Decision details the extraordinary importance of Dr. Reitman’s work and opinion in this case. I have examined a large portion of Exponent’s billing records and am satisfied that the work of their employees, the rates charged and the expenses incurred were reasonably necessary for the successful prosecution of the plaintiffs 93A claim.
The $ 101,276 cost to the plaintiff for Walter Bratic’s professional services, as a principal in Overmont Consulting, LLC, were reasonable and necessary. Earlier in this memorandum, I detailed Mr. Bratic’s work in analyzing the defendants’ claimed offsets to gross profits. His work was labor and detail intensive and his opinion was cogent and credible. The hourly rates he charged for his services and the expenses he incurred in connection therewith are eminently reasonable.
The same holds true with respect to the expert professional services of Atty. Daniel Gleason. The extent and importance of his work are detailed earlier in this memorandum. Mr. Gleason’s hourly rates are reasonable, as are the expenses he incurred in performing that work.
The plaintiff is awarded the full amount of the costs it incurred for Mr.Gleason’s work. That amount is $27,059.
6. AWARD OF COSTS
The court awards the plaintiff its costs of $1,127,944, consisting of the following amounts:
1. Expenses incurred by WGM—$154,881.
2. Expert fees of Exponent, Inc.—$785,586 and direct costs of $59,142.
3. Expert fees of Overmont Consulting, LLC— $97,613 and direct costs of $3663.
4. Expert fees of Atty. Daniel Gleason—$26,964 and direct costs of $95.
INJUNCTIVE RELIEF
The purposes of an injunction in a trade secret case are to protect the secrecy of misappropriated information, to eliminate the unfair advantage obtained by the wrongdoer, and to reinforce the public policy of commercial morality. General Elec. Co. v. Sung, 843 F.Sup. 776, 778 (D.Mass. 1994). However, injunctions granted to prevent trade secret violations are not punitive and only rarely are truly permanent, as they must be reasonable as to time and scope; what is reasonable depends on the facts of each particular case. Curtiss-Wright Corp. v. Edel-Brown Tool & Die Co., Inc., 381 Mass. 1, 10 (1980); Eastern Marble Prod. Corp. v. Roman Marble, Inc., 372 Mass. 835, 842 (1977); Jillian’s Billiard Club of Amer., Inc. v. Belief *172 Billiards, Inc., 35 Mass.App.Ct. 372, 376, rev. den., 416 Mass. 1108 (1993). See also Restatement (Third) of Unfair Competition §44, cmt. c (1995).
SCOPE OF RELIEF
The scope of injunctive relief requires the weighing of numerous factors: the nature of the interest to be protected, the nature and extent of the appropriation, the relative adequacy of other remedies, the interests of third parties and the public, the practicality of framing and enforcing the injunction, and the balance of the harm to the defendants’ legitimate interests from an injunction versus the harm to the plaintiff if injunctive relief is denied. Restatement (Third) of Unfair Competition §44(2).
Here, the appropriate equitable relief calls for the entry of a permanent use injunction and a five-year production injunction.
1. Use Injunction
An injunction should restrain the defendants from misappropriating and using the plaintiffs process, formula, or other trade secret in the future. Picker Int’l Corp. v. Imaging Equip. Serv., Inc., 931 F.Sup. 18, 45 (D.Mass. 1995), aff'd, 1996 U.S.App. LEXIS 21955 (1st Cir. 1996). An injunction may also include the requirement that defendants in possession of misappropriated trade secrets return or destroy all documents or data constituting or containing the trade secrets. Id. at 44-45.
STR requests that JPS be enjoined from using or disclosing STR’s trade secrets relating to the UF Process, including but not limited to JPS manufacturing Methods 1,4 and 5. This court previously determined that Method 1 is identical to the UF Process and that Method 4 and Method 5 are subparts or components of Method 1. Method 4 consists REDACTED REDACTED Method 5 involves REDACTED. This court concluded that Methods 4 and 5 REDACTED that are essential and fundamental elements of the UF Process. This is the equivalent of a finding that these methods are not merely substantially similar to but rather, are substantially derived from the UF Process and not based on publicly available information and JPS’s own skill, knowledge and experience. Trade secret protection extends not only to the trade secret itself but also to materials substantially derived from that trade secret. USM Corp. v. Marson Fastener Corp., 392 Mass. 334, 351 (1984); General Elec. Co. v. Sung, 843 F.Sup. at 779. The issue of derivation is one of fact. See American Can Co. v. Mansukhani, 742 F.2d 314, 331 (7th Cir. 1984). The use injunction thus extends to Methods 4 and 5. See USM Corp. v. Marson Fastener Corp., 392 Mass. at 351 (plaintiff entitled to relief where defendant’s machine incorporated trade secret, and defendant not relieved of liability by virtue of modifications of process if that process is substantially derived from trade secret).
2. Production Injunction
STR also requests that JPS be enjoined from manufacturing, marketing, or selling any “low-shrink” EVA solar encapsulant products. STR asks the court to apply the term “low-shrink” to EVA with an unsupported shrink rate of 40% or less. The evidence at trial established that REDACTED conventional EVA has a shrink rate of at least 40% Both Mr. Tutterow and the defendant Galica have written or testified that a 40% shrink rate was essentially the optimum result under the conventional form of EVA processing.[5] It should be remembered that before it appropriated the plaintiffs trade secret the defendant JPS did not manufacture EVA, conventional or otherwise. It was only after it misappropriated and applied the plaintiffs trade secret that JPS began producing EVA. On the other hand, the plaintiff was well entrenched for many years in the EVA market. Through the inventiveness and work of its employees, especially Mr. Yorgensen, STR attained a competitive advantage in the EVA solar encapsulant market by producing, through its protected manufacturing process, unsupported EVA with an unsupported shrink rate of approximately 1%. The defendant JPS entered into this refined market as a result of stealing and using the plaintiffs trade secret. The defendant JPS has never produced nor offered for sale unsupported EVA with a shrink rate of less than 40%, except for EVA produced using the essential component(s) of STR’s trade secret.
Where a trade secret process is inextricably connected to the manufacture of the product, the court may enjoin against the manufacture of the product itself rather than against the mere use of the process. Eastern Marble Prod. Corp. v. Roman Marble, Inc., 372 Mass. at 839. Cf. Jillian’s Billiard Club of Amer., Inc. v. Beloff Billiards, Inc., 35 Mass.App.Ct. at 377 (judge properly refused to restrain defendant from opening competing billiards club where there was evidence that appropriated financial information was available from other sources, and injunction against use of specific figures/accounting procedures and against public disclosure was sufficient to protect plaintiffs interests). The rationale for a production injunction is that where the misappropriated trade secrets are inextricably connected to the defendants’ manufacture of the product, a use injunction would be ineffective in eliminating the competitive advantage gained by the misappropriator because he cannot be relied on to unlearn or abandon the misappropriated technology. General Elec. Co. v. Sung, 843 F.Sup. at 779-80. Cf. Monovis, Inc. v. Aquino, 905 F.Sup. 1205, 1235 (W.D.N.Y. 1994) (imposing production injunction because defendants’ approach to litigation did little to inspire confidence that they could be relied upon not to use trade secret and to police themselves if permitted to continue in the field).
There is an “inextricable connection” when the trade secrets form such an integral and substantial *173 part of the comprehensive manufacturing process or technology that the defendants would not be able independently to manufacture or design a comparable product. General Elec. Co. v. Sung, 843 F.Sup. at 780. It is relevant to this inquiry whether the defendants had a significant and comparable pre-existing design of its own prior to the misappropriation. Id. There is no credible evidence that JPS would be able to independently create low-shrink EVA using only publicly available information and without relying on STR’s trade secret. JPS had no pre-existing design for production of low-shrink EVA; indeed, JPS never produced any EVA product prior to its misappropriation of the UF Process. Further, it appears that JPS has tried to escape the consequences of its misappropriation by attempting to separate and use individual components of the UF Process to make low-shrink EVA. This evidences an unwillingness to abandon the misappropriated technology. The court infers from JPS’s prior inexperience and bad faith conduct that JPS was and is unable to replicate the UF Process legitimately. See, e.g., Chris M’s Hand Poured Fudge v. Hennon, 699 A.2d 1272, 1277 (Pa.Super. 1997), appeal den., 717 A.2d 1026 (Pa. 1998) (imposing permanent injunction against manufacture or sale of fudge where defendant’s prior lack of experience and theft of former employer’s secret recipe established inextricable connection between trade secret and manufacture of product).
Any production of low-shrink EVA encapsulant by JPS would be inextricably connected to the misappropriated trade secret, making a production injunction appropriate in this case. Cf. Restatement (Third) of Unfair Competition §44, cmt. d (production injunction appropriate where use injunction impossible to enforce due to difficulty of distinguishing further improper use of trade secret from independent discovery). In addition to a general production injunction, STR specifically requests that the court order the dismantling of the REDACTED production line, which apparently was created solely to employ Method 1.
DURATION OF INJUNCTION
STR requests a permanent injunction against both use and production. The duration of injunctive relief in a trade secret case ordinarily should be limited to the time necessary to protect the plaintiff from harm attributable to the misappropriation and to deprive the defendants of any economic advantage attributable thereto. See Restatement (Third) of Unfair Competition §44(3). The court must protect the legitimate interests of the trade secret owner without unduly interfering with legitimate competition by the defendant. Id. at §44, cmt. c. The length of an injunction is typically measured by the amount of time it would have taken for the defendants to legitimately develop the technology at issue independently of the misappropriated trade secret. See Curtiss-Wright Corp. v. Edel-Brown Tool & Die Co., Inc., 381 Mass. at 10; Eastern Marble Prod. Corp. v. Roman Marble, Inc., 372 Mass. at 843; General Elec. Co. v. Sung, 843 F.Sup. at 780.
Nonetheless, an injunction is not unreasonable merely because it is permanent, and the Supreme Judicial Court has approved a permanent injunction in á case where no competitor in forty years was able to produce the plaintiffs product, the defendant was afforded an opportunity to introduce evidence concerning the possibility of reverse engineering but failed, and considerations of commercial morality warranted a permanent injunction. See Curtiss-Wright Corp. v. Edel-Brown Tool & Die Co., Inc., 381 Mass. at 11. See also Eastern Marble Prod. Corp. v. Roman Marble, Inc., 372 Mass. at 839 (judge imposed permanent production injunction where no other manufacturer was able to produce two-tone sinks, but the appellate court remanded for consideration of possibility of reverse engineering); Peggy Lawton Kitchens, Inc. v. Hogan, 18 Mass.App.Ct. 937, 940 (1984) (upholding permanent use injunction as unusual but not unprecedented where plaintiffs recipe produced cookie unique among forty brands of cookies made in New England); Picker Int’l Corp. v. Imaging Equip. Serv., Inc., 931 F.Sup. at 45 (ordering permanent use injunction where defendant engaged in ten-year campaign of misconduct to acquire and use trade secrets which continued even during trial).
Here, there is evidence that independent of STR’s development of the UF process, Richmond Technology in California, Bridgestone in Japan, and Novogieno in Spain were producing low-shrink EVA for use in the solar encapsulant industry. There is also evidence that Breyer recently began to produce low-shrink EVA. However the manufacturing processes used by these companies are not available in the public domain.[6] This case thus is not comparable to Curtiss-Wright or Peggy Lawton in the uniqueness of the product at issue. However, as in Curtiss-Wright reverse engineering is not possible, there is no evidence that JPS would have produced low-shrink EVA without the misappropriation, and JPS’s conduct reveals a high degree of commercial immorality.
On balance, this does not seem to be an appropriate case for the drastic remedy of a permanent production injunction. Under the circumstances, such an injunction would most likely overcompensate STR and stifle legitimate competition.
Where the specific period of time in which the defendants could have lawfully acquired the information is unclear, some courts have awarded indefinite injunctions, with the burden on the defendants to seek a modification when the commercial advantage from the appropriation has ended. See Restatement (Third) of Unfair Competition §44, cmt. f. Cf. Curtiss-Wright Corp. v. Edel-Brown Tool & Die Co., Inc., 381 Mass. at 11, n.8 (court granted permanent injunction but stated, “(w]e do not preclude the possibility that at some time in the future a substantial change of cir *174 cumstances may entitle the defendant to seek judicial consideration as to whether the injunction should be dissolved”). One commentator has stated, “[i]f the misappropriator cannot prove the ability to reverse engineer in a particular time period, he should be enjoined from its use until he actually reverse engineers [or otherwise independently replicates] the technology. This places the misappropri-ator in precisely the position occupied by legitimate replicators. It prevents misappropriators from stealing what they cannot make themselves and then simply biding their time during the period necessary for some ‘average’ competitor to replicate the technology legitimately.” Jamieson, Just Desserts: A Model to Harmonize Trade Secret Injunctions, 72 Neb.L.Rev. 515, 549 (1993). Although this approach has some appeal, it creates complications by requiring the court to retain jurisdiction for undoubtedly complex future proceedings.
On balance, a five-year production injunction, commencing with entry of the judgment, is appropriate. The plaintiff is entitled to have its trade secrets protected at least until others in the trade are likely, through legitimate business procedures, to have become aware of those secrets. See Curtiss-Wright Corp. v. Edel-Brown Tool & Die Co., Inc., 381 Mass. at 10; Eastern Marble Prod. Corp. v. Roman Marble, Inc., 372 Mass. at 843. Restatement (Third) of Unfair Competition §44, cmt. f. The court may consider as one factor the amount of time necessary to reverse engineer the plaintiffs device without improper use of trade secrets. Jet Spray Cooler, Inc. v. Crampton, 377 Mass. 159, 171 n.11 (1979); Eastern Marble Prod. Corp. v. Roman Marble, Inc., 372 Mass. at 843; Analogic Corp. v. Data Translation, Inc., 371 Mass. 643, 647 (1976). Here, however, it is not possible to discover the UF Process by reverse engineering of STR’s low-shrink EVA.
“The experience of other competitors in attempting to acquire the information by proper means is also relevant in determining the time it would have taken the defendant to acquire the information in the absence of the appropriation.” Restatement (Third) of Unfair Competition §44, cmt. f. Cf. Curtiss-Wright Corp. v. Edel-Brown Tool & Die Co., Inc., 381 Mass. at 11 (noting that competitors’ failure to produce comparable product despite marketing of plaintiffs product is significant). Here, there is an absence of evidence concerning the time period in which a person of ordinary skill in the industry could replicate the UF Process or otherwise produce low-shrink EVA through independent discovery. See Restatement (Third) of Unfair Competition §44, cmt. f.
Based on all of the considerations attendant on this case, it is my determination that a five-year production injunction beginning as of the date of entry of judgment will provide reasonable protection to STR from the consequences of the defendants’ wrongful conduct. The five-year period is equivalent to the time it took STR to develop the UF Process.[7] A five-year period is reasonable, although it probably under-compensates STRfor the effects of the misappropriation, given the relative positions of the two companies. Using the five-year period that it took STR to develop the technology assumes that JPS was in a position to invest the same number of hours, same level of talent, same equipment, and same amount of financial resources in the effort to create low-shrink EVA. This seems unlikely given that it had not yet produced any EVA encapsulant and was thus starting from scratch compared to STR which already produced low-shrink EVA and had already achieved a significantly small shrinkage rate before discovering the secret to 1% restricted shrinkage. Moreover, in determining the length of the injunction, the court may take into account that the defendants were willful rather than innocent wrongdoers. See General Elec. Co. v. Sung, 843 F.Sup. at 780.
The production injunction will run from the date of the entry of judgment rather than the date of the misappropriation. An injunction of somewhat longer duration would otherwise be appropriate but for the fact that the defendants have not been permitted to produce or sell low-shrink EVA since June 29, 2009, the date of the preliminary injunction.
ORDER FOR ENTRY OF FINAL JUDGMENT
It is ORDERED that final judgment enters as follows.
Count Three: G.L.c. 93A, §§2 and 11: Final Judgment is to enter for the Plaintiff Specialized Technology Resources, Inc. on Count 3 and the Plaintiff shall recover from the Defendants JPS Elastomerics Corp. and James P. Galica, jointly and severally, One Million Seventy-five Thousand Five Hundred Fifty-six Dollars ($1,075,556) in actual monetary damages with interest thereon at the statutory rate of 12% calculated from October 2, 2007, the date the complaint was entered. The Plaintiff shall also recover from the Defendants, jointly and severally, Two Million One Hundred Fifty-one Thousand One Hundred and Twelve Dollars ($2,151,112) in punitive damages with interest thereon at the statutory rate of 12% calculated from the date of entry of the final judgment; the Plaintiff shall also recover from the Defendants, jointly and severally, Three Million Nine Hundred Two Thousand Five Hundred and Ninety-five Dollars ($3,902,595) for the Plaintiffs reasonable and necessary attorneys fees with interest thereon at the statutory rate of 12% calculated from the date of entry of the final judgment; the Plaintiff shall also recover from the Defendants, jointly and severally, One Million One Hundred Twenty-seven Thousand Nine Hundred Forty-four Dollars ($1,127,944) with interest thereon at the statutory rate of 12% calculated from the date of entry of the final judgment.
*175 Defendants JPS Elastomerics Corp. and James P. Galica are hereby enjoined and ordered as follows:
1. The Defendants and all persons acting on their behalf or in concert with them are permanently enjoined and restrained from manufacturing, marketing, or selling any product made using any aspect of STR’s “user-friendly” ethylene vinyl acetate (EVA) process (UF Process), including, but not limited to, Defendants manufacturing of products using Methods 1, 4, and 5 (collectively, “the Trade Secrets”), and from disclosing, or otherwise using any aspect of the Trade Secrets.
2. The Defendants and all persons acting on their behalf or in concert with them are enjoined for five (5) years beginning with the entry of this order and the judgment from manufacturing, marketing or selling any “low-shrink” EVA solar encapsulant products. For purposes of this injunction, ahy EVA that shrinks less than 40% is deemed low-shrink EVA.
3. The Defendants having used STR’s trade secrets to build what is known as the “REDACTED” line, are permanently enjoined from using, selling, displaying, transferring, modifying, disclosing or otherwise benefiting from or utilizing the REDACTED line or information relating to the REDACTED line in any manner. Further, it is ordered that a contractor acceptable to STR, and subject to an express confidentiality order endorsed by this court, be engaged at Defendants’ expense to develop a process, acceptable to STR, to dismantle the REDACTED line in a manner that does not expose STR’s trade secrets to further dissemination. All information Defendants have provided to third parties relating to the REDACTED line shall be isolated, returned and remediated in the manner prescribed in paragraphs 4-6 herein.
4. The Defendants shall search all their electronic systems, including their servers, freestanding computers, mainframes, databases, laptops, desktops, and all other work stations as well as any places where archived electronic information is stored (hereinafter “Defendants’ Systems”) for any remaining data or documents related to the Trade Secrets. As used herein, data or documents relate to the Trade Secrets if any document (or portion thereof) or other information refers or relates in any way to (a) STR’s UF product; (b) STR’s UF process; and/or (c) Methods 1, 4, and 5. To accomplish this search, the Defendants shall engage an independent computer forensic search firm (the “eFirm”) acceptable to STR. The eFirm shall then conduct a search of the Defendants’ Systems using search methods and terms mutually agreed upon by the parties. The results of the search shall be reviewed by Defendants’ counsel in the first instance to determine whether the documents are responsive. If Defendants’ counsel considers any document located in the search does not contain data related to STR’s Trade Secrets, counsel shall list the document in a log, similar to a privilege log, reasonably identifying the document, its location and the general nature of its content. The defendants shall provide the log to STR. If STR disputes any entry on the log, the documents in question shall be produced to STR’s counsel pursuant to the terms of the Protective Order in Civil Action No. 2007-HSCV-200. If the parties are unable to resolve their dispute as to any documents listed on the log, the court will review the documents and make the final decision as to deletion from the Defendants’ Systems after giving the parties an opportunity to be heard orally or in writing, as the court deems appropriate. The Defendants shall permanently delete from their system all responsive documents in accordance with paragraph 6 below.
5. The Defendants shall also conduct a physical search of the offices and other storage locations used by any of Defendants’ employees, agents or those acting in concert with or on their behalf, who is known to have offered or received (a) electronic or hard copy documents relating to the Trade Secrets; or (b) training in which said documents were used. The Defendants shall interview each current employee whose offices were searched to determine whether the employee has used or disseminated documents containing the Trade Secrets and, if so, the nature of such use and the identity of any person to whom or entity to which the Trade Secrets were disseminated. The Defendants shall then cause a physical search to be conducted of the office and storage locations of any recipient who is employed by the Defendant JPS in accordance with the interview and follow-up procedure described herein. This process will continue until all of the Defendants’ employees known to have authored, received, or disseminated such documents have been interviewed and their offices and storage locations searched. If one or more of the Defendants’ employees is determined to have transmitted documents or other data related to the Trade Secrets to any person or entity, the Defendants shall take reasonable steps to retrieve the documents in question. The Defendants shall destroy in accordance with Paragraph 6 hereof all hard copy materials located pursuant to the procedures specified in this Paragraph.
6. The Defendants shall produce to STR all electronic and hard copy documents relating to the Trade Secrets (as described in Paragraph 4 herein) which (a) have been disseminated to or accessed by any person or entity other than the Defendants or (b) contain data related to the Trade Secrets. If a document containing the Trade Secrets has been disseminated to or accessed by any person or entity other than the Defendants, the Defendants shall also produce whatever documents evidence such access and/or dissemination (unless previously produced in this proceeding) and shall take reason *176 able steps to retrieve the document containing the Trade Secrets. In the event that no document evidencing such access or dissemination exists, the Defendants shall disclose to STR the identity of each such non-Defendantperson or entity accessingor receiving any such Trade Secrets and shall identify the Trade Secret that person or entity accessed or received. If neither (a) nor (b) of this Paragraph 6 applies to a document relating to the Trade Secrets, the Defendants shall cause that document to be permanently deleted from the Defendants’ Systems in the presence of an appropriate eFirm representative. All hard copies of such documents shall also be destroyed. An officer of, or another person authorized to sign on behalf of, the eFirm shall provide both parties with a sworn statement, executed under penalty of perjury and based upon personal knowledge, attesting to the permanent deletion of such electronic documents containing the Trade Secrets. An officer of, or another person authorized to sign on behalf of, the Defendants shall provide to STR a sworn statement, executed under penalty of perjury and based upon personal knowledge, attesting to the destruction of the hard copy documents containing the Trade Secrets. After the Defendants have provided STR with all documents relating to the Trade Secrets that fall within either (a) or (b) of this Paragraph 6, the Defendants shall cause those documents as well to be permanently deleted from their systems and all hard copies destroyed. An officer or person authorized to sign on behalf of the eFirm shall provide both parties with a sworn statement, executed under penalty of perjury and based upon personal knowledge, attesting to the permanent deletion of all remaining electronic documents containing the Trade Secrets. An officer of, or another person authorized to sign on behalf of, the Defendants shall provide to STR a sworn statement, executed under penalty of perjury and based upon personal knowledge, attesting to the destruction of all remaining hard copy documents relating to the Trade Secrets.
Count 4—Breach of Contract Against Defendant Galica: Count 4 is dismissed without costs to either party; the jury having returned a verdict finding the Defendant Galica breached his employment contract with the plaintiff, but not having found monetary damages.
Counts 1, 2, and 5—Claims for Misappropriation of Trade Secrets: Judgment shall enter for the defendants JPS Elastomerics, Inc. and James P. Galica, without costs; the jury having returned a verdict finding that the defendants did not misappropriate the plaintiffs trade secret.

Method 1 is the defendant JPS’s low-shrink EVA manufacturing process described in the original Memorandum of Decision. The defendants were able to design Method 1 as a direct result of its intentional misappropriation of the plaintiffs trade secret, known as the UF manufacturing process. The existence of Methods 4 & 5 was not disclosed by the defendants until after the issuance of the original Memorandum of Decision and Preliminary Injunction. As a result of subsequent hearings and a view of the manufacturing lines, this court determined that Methods 4 & 5 incorporated essential and protected components of the plaintiffs UF process. The hearings disclosed that Methods 4 & 5, unlike Method 1, had not yet resulted in the successful production of low-shrink EVA. The preliminary injunction was expressly revised to include Methods 4 & 5 and exclude Methods 2 & 3 which do not implicate the plaintiffs trade secret.

Corporate income tax, if any, is not included in the offset since JPS did not offer evidence relative to its tax status or the actual tax consequences resulting from its sales of the infringing product.

Plaintiff correctly points out that the revelation of the existence of this line and the costs incurred in its building underscores the magnitude of the defendants’ wrongdoing. Clearly, JPS was willing to invest significant capital in order to exploit expected profits from the theft of the plaintiffs trade secret.

I have not included expenses incurred by Mr. Newton’s and Mr. Pucci’s respective law firms. I would have to examine their billing records line-by-line in order to extrapolate their expenses. I decline to do so.

In July 2010, the defendant JPS filed a complaint in the United States District Court for the District of Massachusetts claiming that this case is “sham litigation” and seeking various forms of redress from the federal court. (USDC-MA, C.A. No. 10-cv-11141-MAP.) In its original complaint filed with the federal court, JPS averred that “traditional EVA encapsu-lants typically exhibit an unsupported shrink rate of forty percent (40%) or higher.” A month after that filing this court conducted the last hearings relating to injunctive relief. At that August 2010 hearing the meaning of unsupported shrink rates was of importance. Following the August hearing in this court, the defendant amended its complaint in the federal court by deleting its earlier reference to unsupported shrink rates of 40% or higher.

JPS claims that Mr. Yorgensen explained Richmond Technologies’ EVA low-shrink manufacturing process during his testimony and this, according to the defendant, demonstrates that Richmond’s manufacturing process is in the public domain. The defendant mischaracterizes Mr. Yorgensen’s testimony. During cross-examination, defense counsel asked Mr. Yorgensen for his opinion about the manufacturing process Richmond might be employing. Mr. Yorgensen expressed his personal view regarding how Richmond might be manufacturing its low-shrink EVA product; he never claimed that he actually knew what manufacturing process Richmond used.

The defendants attempt to minimize the plaintiffs careful and controlled development of its UF process by claiming that Mr. Yourgensen spent only 25 hours over the course of five years in developing the process. The defendants’ contention mischaracterizes the evidence at trial. STR employees, led by Mr. Yourgensen, extended significant periods of time each month over the course of a five-year period in order to develop the UF manufacturing process. The 25 hours cited by the defendants takes into account only the formal laboratory testing conducted by Mr. Yourgensen to determine success or failure of various proposed manufacturing methods. The defendants ignore the time-consuming and often vexing efforts of the plaintiffs employees that ultimately resulted in the successful UF manufacturing process.