NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

22-P-941                                          Appeals Court

BRUCE JOHNSON  vs.  CAROLINE SETTINO.

No. 22-P-941.

Plymouth.     March 1, 2023. – September 13, 2023.

Present:  Milkey, Singh, & Brennan, JJ.

Marriage.  Gift.  Damages, Interest.  Interest.  Practice,
    Civil, Interest.


Civil action commenced in the Superior Court Department on
January 16, 2018.

The case was heard by Brian S. Glenny, J., and a motion to
alter or amend the judgment also was heard by him.


Stephanie T. Siden for the plaintiff.
Caroline Settino, pro se.


SINGH, J.  Under current Massachusetts law, "[i]t is

generally held that an engagement ring is in the nature of a

pledge, given on the implied condition that the marriage shall

take place.  If the contract to marry is terminated without

fault on the part of the donor[, the donor] may recover the

ring" (emphasis added).  De Cicco v. Barker, 339 Mass. 457, 458

(1959).  The central question presented in this appeal is how "fault" must be assessed in this context.

After calling off their wedding and ending the parties' engagement, the plaintiff brought this action in the Superior Court against his former fiancée, seeking the recovery of an engagement ring and two wedding bands that he had purchased.  The defendant counterclaimed for breach of contract seeking funds to complete a dental implant surgery that the plaintiff had promised to pay for during their relationship.[1]

We reverse the Superior Court judge's disposition awarding the engagement ring and one wedding band to the defendant and vacate the award of prejudgment interest, which is to be recalculated on remand.

Background.  We summarize the facts found by the trial judge, together with other undisputed background facts appearing in the record.  See Cavadi v. DeYeso, 458 Mass. 615, 617 (2011).

The plaintiff and the defendant met in the summer of 2016 and began dating soon afterward.  Their relationship quickly became serious over the first few months.  The two would often travel together, visiting places such as New York City; Bar

---

[1] The defendant also brought a counterclaim for intentional infliction of emotional distress.  A Superior Court judge granted summary judgment for the plaintiff on that count, and it is not at issue on appeal.

Harbor, Maine; the Virgin Islands; and Italy.  The plaintiff paid for these vacations and expected nothing from the defendant in return.  He also often bought the defendant expensive gifts, including jewelry, clothing, shoes, handbags, and artwork.  It was the plaintiff's custom to provide the defendant with receipts for the gifts.

Additionally, the plaintiff would help the defendant with certain medical expenses.  For example, after the defendant conveyed that she was interested in undergoing dental implant surgery, the plaintiff stated that he would pay for the procedure.  The plaintiff then paid for the defendant to complete the first part of the procedure, the extraction of her upper teeth.

The plaintiff and defendant began to have discussions about getting married.  The two went shopping for engagement rings several times.  After visiting multiple stores, the plaintiff eventually bought a diamond ring from a jeweler in Boston, valued at over $70,000.[2]  After months of discussions, the plaintiff planned his proposal.

In August 2017, the two went to lunch with the defendant's parents.  Once the defendant stepped away from the table, the plaintiff asked her father for permission to marry her, to which

---

[2] The plaintiff gave the defendant the receipt for the ring.

the father said yes.  Later that day, the plaintiff and defendant had dinner at a restaurant where the plaintiff had arranged ahead of time to be seated at a corner-window table. During dinner, the plaintiff asked the defendant to marry him and presented her with the diamond engagement ring.  The defendant said yes and placed the ring on her own left ring finger.[3]  The ring was given, and accepted, in anticipation of marriage.

Soon after, the plaintiff and defendant began planning their wedding.  In October 2017, the plaintiff purchased two wedding bands at a cost of just over $3,700, one engraved with his initials and the other with the defendant's.  The plaintiff later gave the two wedding bands to the defendant; these were also given in anticipation of marriage.  As he had with the engagement ring, the plaintiff provided the defendant with a receipt for the wedding bands.

As the wedding planning progressed, the plaintiff noticed that he found some traits of the defendant to be troubling.

---

[3] In many cultures, the finger next to the little finger on the left hand is known as the "ring finger" and is reserved for the engagement ring and wedding band.  See H. Swinburne, A Treatise of Spousals, or Matrimonial Contracts § 15, at 208 (1686) (placement of matrimonial ring on left ring finger has roots in belief that "Vena amoris," vein of love, runs directly from ring finger to heart).

Following their engagement, the plaintiff began to feel that he was routinely subject to verbal abuse. For instance, the defendant would berate the plaintiff over a spilled drink, how he ate oysters, and the time it took him to access messages on his cell phone. She would call him a "moron" and treat him like a child. If something went wrong, he was to blame. If the plaintiff stood up for himself, the defendant would yell at him and storm away. The plaintiff also felt that the defendant did not appreciate any of his accomplishments, and that she did not support him following his cancer diagnosis. Despite these concerns, the plaintiff thought they could fix these issues and make the relationship work.

One evening in November 2017, however, following dinner and drinks, the plaintiff and defendant got into an argument. During the argument, the defendant said, "I'm a good-looking woman. I can get a man whenever I want." Disturbed by the defendant's comment, the plaintiff looked through the defendant's cell phone and came across a text message (text) to a man whose name the plaintiff did not know. The text stated: "My Bruce is going to be in Connecticut for three days. I need some playtime." The plaintiff interpreted this as an invitation for sex. The plaintiff also listened to a voicemail message from the same individual where the man lamented the fact that the defendant did not see him often enough. Given that the

plaintiff's first marriage had ended due to unfaithfulness, he was very cautious and intolerant of infidelity.

The next morning, the plaintiff confronted the defendant about the messages and accused her of having an affair. She denied the accusation and explained that the man was her best friend of over forty years and that their friendship was strictly platonic. A week or two later, the plaintiff called the defendant and ended their engagement by leaving a voicemail message, stating that he felt disrespected and that he could not trust her.[4] This lawsuit followed.

After a jury-waived trial, a Superior Court judge found that the plaintiff was mistaken in his belief that the defendant was having an affair and thus, the plaintiff had to bear the fault for the parties' separation. He awarded the engagement ring and one of the two wedding bands to the defendant.[5] The judge also entered judgment for the defendant on her counterclaim, ordering the plaintiff to pay "the reasonable costs to complete [the defendant's] dental procedure of $42,982" in addition to over $20,000 in prejudgment interest.

---

[4] The plaintiff testified as to why he was skeptical of the defendant's explanation: "I'm thinking, well, [i]f it's your best friend and I'm your fiancé, how come I never met him? How come I never heard of him? You know? You gotta wonder."

[5] The other wedding band was awarded to the plaintiff and is not at issue in this appeal.

Discussion.  On appeal, the plaintiff challenges two aspects of the judge's decision:  (1) the finding of fault with respect to the engagement ring and wedding band, and (2) the award of prejudgment interest on the defendant's counterclaim. On review of a jury-waived trial, "'[t]he findings of fact of the judge are accepted unless they are clearly erroneous' and '[w]e review the judge's legal conclusions de novo'" (citation omitted).  Cavadi, 458 Mass. at 624.  "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.  On the other hand, to ensure that the ultimate findings and conclusions are consistent with the law, we scrutinize without deference the legal standard which the judge applied to the facts" (citation omitted).  Kendall v. Selvaggio, 413 Mass. 619, 620-621 (1992).

1.  Engagement ring and wedding band.  The plaintiff argues that the trial judge erred in faulting him for the parties' separation and thus he is entitled to the return of the rings. He contends that the judge improperly held him liable solely because he was the one to terminate the engagement.  The defendant counters that the trial judge's decision was supported by detailed findings that are not clearly erroneous and therefore must be upheld.  We begin our analysis with the Supreme Judicial Court's decision in De Cicco, 339 Mass. 457,

the seminal case in Massachusetts on which the trial judge
relied.[6]

In <u>De Cicco</u>, 339 Mass. at 457-458, the plaintiff brought a
suit in equity to recover from his former fiancée, among other
items, a six-carat diamond engagement ring that was given in
contemplation of marriage.  The Supreme Judicial Court
recognized in its decision that

> "[i]t is generally held that an engagement ring is in the
> nature of a pledge, given on the implied condition that the
> marriage shall take place.  If the contract to marry is
> terminated <u>without fault</u> on the part of the donor he may
> recover the ring" (emphasis added).

<u>Id</u>. at 458.  The court did not expound on the meaning of
"fault," but went on to hold that the plaintiff was entitled to
the return of the ring.  See <u>id</u>. at 459.  In doing so, the court
rejected the defendant's argument that the plaintiff's suit was
barred by Massachusetts' "Heart Balm" statute, G. L. c. 207,
§ 47A,[7] which bars all causes of action for breach of a contract

---

[6] The issue in <u>De Cicco</u> was whether any action to recover an
engagement ring could be maintained and not whether the
plaintiff was entitled to recover under the facts presented.
See <u>De Cicco</u>, 339 Mass. at 458-459.  There, it had been
determined that "the defendant broke the engagement without
'adequate cause' or 'fault' on the part of the plaintiff."  <u>Id</u>.
at 458.  As there was no challenge to this determination, the
issues of fault and what constitutes adequate cause to break an
engagement were not discussed.

[7] General Laws c. 207, § 47A, states:  "Breach of contract
to marry shall not constitute an injury or wrong recognized by
law, and no action, suit or proceeding shall be maintained
therefor."

to marry.  See De Cicco, supra at 458-459.  See also Shea v. Cameron, 92 Mass. App. Ct. 731, 736-738 (2018).  The court reasoned that the plaintiff's suit was a proceeding, not to recover damages for breach of the contract to marry, but to prevent unjust enrichment.  See De Cicco, supra at 459.

In the many years since the Supreme Judicial Court decided De Cicco, our appellate courts have not addressed how fault should be assessed in this context.  Case law from other jurisdictions in the United States reveals three general approaches to resolving the question before us.

A minority of States employ the traditional fault-based approach (the old majority view), where courts consider the facts of a particular case and make a fault determination to resolve which party owns the ring.  This approach generally permits recovery based on a conditional gift theory.  Courts have differed, however, on how to assess fault under this approach.  In some cases, fault is assigned based on whose actions ended the engagement -- i.e., who broke it off.[8]  In others, courts determine fault by assessing whose underlying conduct was responsible or caused the breakup to occur.[9]

---

[8] See, e.g., Schultz v. Duitz, 253 Ky. 135, 140-142 (1934); Curtis v. Anderson, 106 S.W.3d 251, 255-256 (Tex. App. 2003).

[9] See, e.g., Simonian v. Donoian, 96 Cal. App. 2d 259, 261-262 (1950); Clippard v. Pfefferkorn, 168 S.W.3d 616, 619-620 (Mo. Ct. App. 2005); Spinnell v. Quigley, 56 Wa. App. 799, 802

Next, there is the so-called modern no-fault approach, which has emerged as the majority rule across the country. In employing this approach, courts generally view the ring as a conditional gift that must be returned to the donor if the engagement is terminated,[10] regardless of fault.[11]

Finally, at least one State has adopted a third approach, rejecting the theory that an engagement ring is a conditional gift given in contemplation of marriage, and instead adopting

_____

(1990) ("The donee should keep the ring only if the donor unjustifiably breaks the engagement").

[10] See, e.g., Fowler v. Perry, 830 N.E.2d 97, 106 (Ind. Ct. App. 2005); Fierro v. Hoel, 465 N.W.2d 669, 672 (Iowa Ct. App. 1990); Heiman v. Parrish, 262 Kan. 926, 936 (1997); Meyer v. Mitnick, 244 Mich. App. 697, 703-704 (2001); Benassi v. Back & Neck Pain Clinic, Inc., 629 N.W.2d 475, 486 (Minn. App. 2001); Aronow v. Silver, 223 N.J. Super. 344, 348-350 (Ch. Div. 1987); Vigil v. Haber, 119 N.M. 9, 11 (1994); Gaden v. Gaden, 29 N.Y.2d 80, 88-89 (1971); McIntire v. Raukhorst, 65 Ohio App. 3d 728, 730-731 (1989); Cooper v. Smith, 155 Ohio App. 3d 218, 226 (2003); Lindh v. Surman, 560 Pa. 1, 8-9 (1999); Campbell v. Robinson, 398 S.C. 12, 21-22 (Ct. App. 2012); Crippen vs. Campbell, Tenn. Ct. App., No. E2007-00309-COA-R3-CV (Sept. 24, 2007); Brown v. Thomas, 127 Wis. 2d 318, 328-330 (Ct. App. 1985).

[11] One State has recognized a narrow exception to the no-fault view, reserving the consideration of fault for "extremely gross and rare situations" that may arise. Heiman, 262 Kan. at 937, quoting Marriage of Sommers, 246 Kan. 652, 657 (1990). Other jurisdictions have applied the "unclean hands" doctrine to bar recovery by a donor who could not legally marry at the time of the engagement. See, e.g., Lowe v. Quinn, 27 N.Y.2d 397, 400-401 (1971). But see Fontanarosa v. Connors, 2021-Ohio-2346, at par. 21-22 (Ct. App.) (when donee is aware that donor was married at time of engagement, unclean hands doctrine does not apply).

what is in essence a no-fault rule for the donee by treating the ring as an irrevocable inter vivos gift.[12]

As for the remaining jurisdictions, some States have not considered what approach to apply in determining the ownership of an engagement ring following a failed prenuptial relationship,[13] and others appear to have not yet decided how fault should be assessed in the circumstances presented in this appeal.[14]

Here, the plaintiff urges us to conclude that an assessment of fault requires some sort of justification analysis; in other words, a party should be found at fault for breaking off an

---

[12] Albinger v. Harris, 310 Mont. 27, 40 (2002).

[13] See, e.g., Bradley v. Sharp, 144 Haw. 59 (Ct. App. Jan. 31, 2019) ("Although Hawai'i appellate courts have never considered the question, engagement rings are generally recognized as gifts conditioned upon marriage"); Maffe vs. Loranger, Conn. Super. Ct., No. CV196108439S (Jan. 28, 2021) ("it is unclear what standard the supreme or appellate court [of Connecticut] would apply to a case involving a claim for the return [of] an engagement ring given in contemplation of marriage, when the parties fail to get married"); Lowman vs. Martino, R.I. Super. Ct., No. PC 2012-6634 (Jan. 13, 2016) ("Rhode Island precedent is silent as to who owns an engagement ring when a marriage does not ensue").

[14] See, e.g., Hattaway v. Coulter, 360 So. 3d 1047 (Ala. Civ. App. 2021); Gill v. Shively, 320 So. 2d 415, 416-417 (Fla. Dist. Ct. App. 1975); Carroll v. Curry, 392 Ill. App. 3d 511, 518-520 (2009); Busse v. Lambert, 773 So. 2d 182, 183-184 (La. Ct. App. 2000); Cooley v. Tucker, 200 So. 3d 474, 476 (Miss. Ct. App. 2016); Gikas v. Nicholis, 96 N.H. 177, 179 (1950); Fanning v. Iversen, 535 N.W.2d 770, 773-775 (S.D. 1995); McGrath v. Dockendorf, 292 Va. 834, 840 n.3 (2016).

engagement only if the party does so without justification.  In the alternative, the plaintiff asks us to adopt the modern no-fault rule in favor of the donor.  While the adoption of the no-fault approach would be in keeping with Massachusetts' no-fault divorce provisions under G. L. c. 208, §§ 1A and 1B,[15] see Lindh v. Surman, 560 Pa. 1, 7 (1999) ("Courts that have applied no-fault principles to engagement ring cases have borrowed from the policies of their respective legislatures that have moved away from the notion of fault in their divorce statutes"), that is not our prerogative as an intermediate appellate court.  If Massachusetts is to join States that have held that the consideration of fault has no place in determining ownership of an engagement ring following a broken engagement, see note 10, supra, it will have to come from the Supreme Judicial Court or the Legislature.  See Gerber v. Worcester, 1 Mass. App. Ct. 811, 812 (1973).

In any event, De Cicco indicates that Massachusetts applies the conditional gift fault-based approach.  See De Cicco, 339 Mass. at 458-459.  Although fault is variously defined in different legal contexts, see, e.g., Helfman v. Northeastern

---

[15] In 1975, after the Supreme Judicial Court's decision in De Cicco, the Massachusetts Legislature added "an irretrievable breakdown of the marriage" as a ground for divorce.  St. 1975, c. 698, amending G. L. c. 208, § 1, and inserting G. L. c. 208, §§ 1A and 1B.

<u>Univ.</u>, 485 Mass. 308, 315 (2020) (listing elements of negligence), "no legal standard exists by which a fact finder can adjudge culpability or fault in a prenuptial breakup."[16] <u>Campbell</u> v. <u>Robinson</u>, 398 S.C. 12, 21 (Ct. App. 2012), and cases cited. Whatever the definition, in our view, it cannot be that the person at fault for a relationship break-up is simply the one who decides to end it; common sense dictates that a party

---

[16] And perhaps for good reason: "What is fault or the unjustifiable calling off of an engagement?" <u>Heiman</u> v. <u>Parrish</u>, 262 Kan. 926, 935 (1999). This question often poses a difficult, if not impossible, task for a court to undertake. See <u>Benassi</u> v. <u>Back & Neck Pain Clinic, Inc</u>., 629 N.W.2d 475, 486 (Minn. App. 2001) ("'Fault,' for these purposes, is a deceptively elusive concept; because it is impossible to fix with any certainty, it should not be given legal significance"); <u>McIntire</u> v. <u>Raukhorst</u>, 65 Ohio App. 3d 728, 730 (1989) (no-fault rule "eliminates the need for a trial court to attempt the often impossible task of determining which, if either, party is at fault").

As the Kansas Supreme Court aptly put in addressing the difficulties of a fault-based approach:

"By way of illustration, should courts be asked to determine which of the following grounds for breaking an engagement is fault or justified? (1) The parties have nothing in common; (2) one party cannot stand prospective in-laws; (3) a minor child of one of the parties is hostile to and will not accept the other party; (4) an adult child of one of the parties will not accept the other party; (5) the parties' pets do not get along; (6) a party was too hasty in proposing or accepting the proposal; (7) the engagement was a rebound situation which is now regretted; (8) one party has untidy habits that irritate the other; or (9) the parties have religious differences. The list could be endless."

<u>Heiman</u>, 262 Kan. at 935.

who ends an engagement is not necessarily the one to blame for that result.[17]  See Webster's Third New International Dictionary 829 (2002) (fault defined as "responsibility for wrongdoing or failure").  Were it otherwise, fault in the engagement termination context would be more akin to strict liability.  See Clark-Aiken Co. v. Cromwell-Wright Co., 367 Mass. 70, 73 (1975) (characterizing strict liability as "absolute liability without fault" [emphasis added]).  We thus agree with the plaintiff, as well as the majority of jurisdictions employing a conditional gift fault-based approach, that a justification analysis is needed to assess fault in these circumstances.

We now turn to review the judge's finding of fault in this case.  Rather than assess the plaintiff's conduct, it appears that the judge focused his attention on the defendant's conduct: "The Court finds that [the plaintiff] has failed to show by a preponderance of the evidence that [the defendant] was having a sexual affair."  Yet, that was not the plaintiff's burden, nor what the plaintiff set out to prove.  Rather, the plaintiff

---

[17] See Cooper v. Smith, 155 Ohio App. 3d 218, 225 (2008) ("The fault-based approach permits the donor to recover the gifts unless he or she unjustifiably broke the engagement"); Lindh, 560 Pa. at 6 ("Under a fault-based analysis, return of the ring depends on an assessment of who broke the engagement, which necessarily entails a determination of why that person broke the engagement"); Spinnell v. Quigley, 56 Wa. App. 799, 802 (1990) ("The donee should keep the ring only if the donor unjustifiably breaks the engagement").

sought to establish that he was without fault and thus entitled to return of the rings in accordance with De Cicco.[18]  As foreshadowed in his opening statement, the plaintiff attempted to show that his termination of the engagement was based on circumstances which reasonably led him to lose faith and trust in the defendant.[19]  The question was never whether the defendant was actually having an affair; it was whether the plaintiff terminated the engagement without fault.

As to any assessment of the plaintiff's fault, the only culpable conduct identified by the judge was the plaintiff's termination of the engagement based on a mistaken belief:

> "The Court finds that [the plaintiff] was responsible for the ending of the engagement, and not [the defendant].  It was a choice made solely by [the plaintiff].  The Court finds that the ending of the relationship was solely the decision of [the plaintiff], based predominately on his belief, albeit mistaken, that [the defendant] was having sexual relations with another man behind his back.  The Court finds that [the plaintiff] based his decision on the

---

[18] In his opening, the plaintiff's counsel stated:  "Your Honor, we feel this is a clear case because I think we'll be able to show fairly convincingly that [the plaintiff] did nothing wrong in ending his relationship with [the defendant].  As a matter of Massachusetts law, because he is without fault, the rule is that the rings go back to him."

[19] "You'll hear how these texts and voicemails caused [the plaintiff] to understandably end his relationship with [the defendant] because he could not trust her anymore. . . .  [The plaintiff] reasonably interpreted this text message and voicemail as evidence of [the defendant] having an affair."

discovery of texts and voice mails and not on the way [the defendant] treated him."[20]

It appears that the judge, having found the defendant to be not at fault because she was not having a sexual affair,[21] concluded that the plaintiff must be at fault:

"The Court finds that [the plaintiff] must bear the fault for the breakup of this engagement. [The plaintiff] cites no case where the reasonableness of [his] actions is the measuring stick. The plaintiff mistakenly thought [the defendant was cheating on him and called off the engagement, something [the defendant] neither sought nor wanted."

That the defendant was not at fault and did not want to end the engagement does not mean that the plaintiff was at fault. In removing the reasonableness of the plaintiff's conduct from the calculus, the judge failed to consider whether the circumstances were such that the plaintiff may have been justified or had adequate cause to break off the engagement, in other words, that

---

[20] This finding appears to be in conflict with another finding in which the judge concluded that the plaintiff called off the wedding based, not only on his discovery of the texts and voicemail messages on the defendant's phone, but also on his perception of how the defendant mistreated him.

[21] Although the judge appeared to consider the defendant to be at fault if she were actually having a sexual relationship with another person, infidelity could be considered in broader terms, for example, maintaining a secret best friend. See A. Krueger, Emotional Infidelity: What It Is and How to Address It, https://www.brides.com/what-is-emotional-infidelity-5101139 [https://perma.cc/39QQ-VAM6] ("emotional infidelity describes relationships that break the boundaries of exclusive relationships but are not sexual or physical").

he may have been "without fault," the relevant inquiry as set out in De Cicco.

Accepting the judge's subsidiary factual findings, we conclude that the evidence was insufficient to sustain a finding that the plaintiff was "at fault" for the parties' separation. See Kendall, 413 Mass. at 621 ("the 'clearly erroneous' standard of appellate review does not protect findings of fact or conclusions based on incorrect legal standards"). Although the plaintiff may have largely been motivated by a mistaken belief, we cannot say that he was unjustified or did not have adequate cause to break the engagement under the circumstances presented.[22] Sometimes there simply is no fault to be had. See Gaden v. Gaden, 29 N.Y.2d 80, 88 (1971) ("In truth, in most broken engagements there is no real fault").

The plaintiff is entitled to the return of the engagement ring and wedding band.[23] Judgment shall enter for the plaintiff on this count.

---

[22] The plaintiff testified at trial that it was "not just this one instance that caused [him] to end [the relationship]. It was the whole experience." He also testified that when ending the engagement, he told the defendant, "You don't respect me and I can't trust you."

[23] We discern no principled reason why the wedding band should be treated differently than the engagement ring as both were given in anticipation of marriage.

2. _Prejudgment interest_. The plaintiff next argues that the judge erred in awarding prejudgment interest on the damages for the defendant's breach of contract counterclaim -- the plaintiff's failure to pay for the defendant's dental implant surgery.

Prejudgment interest on a claim based in contract is governed by G. L. c. 231, § 6C, which provides:

> "In all actions based on contractual obligations, upon a verdict, finding or order for judgment for pecuniary damages, interest shall be added by the clerk of the court to the amount of damages, at the contract rate, if established, or at the rate of twelve per cent per annum from the date of the breach or demand."

G. L. c. 231, § 6C.

The purpose of § 6C is to compensate a "party for the loss of use or unlawful detention of money" after the date payment is due (citation omitted). _Sterilite Corp_. v. _Continental Cas. Co_., 397 Mass. 837, 841-842 (1986). In the ordinary course, the statute "commands a ministerial act" by the clerk of the court. _O'Malley_ v. _O'Malley_, 419 Mass. 377, 381 (1995). However, a judge has the authority to decline to award prejudgment interest where it would result in a windfall to the recipient. See _Sterilite Corp_., _supra_; _USM Corp_. v. _Marson Fastener Corp_., 392 Mass. 334, 350-351 (1984) ("The judge's determination not to award prejudgment interest was proper in the circumstances"). The matter is one of "balancing equities." _USM Corp_., _supra_ at

350. See <u>Bank</u> v. <u>Thermo Elemental Inc</u>., 451 Mass. 638, 662-663 (2008).

The plaintiff contends that the judge erred in not declining to award prejudgment interest in this case because the defendant did not get the dental implant surgery prior to trial and "she was therefore not out of pocket any monies." Relying on <u>Sterilite Corp</u>., 397 Mass. at 842, the plaintiff argues that the award of prejudgment interest to the defendant on a sum that she did not actually expend prior to trial results in a windfall to her. We disagree.

<u>Sterilite</u> involved an insurer's breach of the duty to defend under an insurance policy. See <u>Sterilite</u>, 397 Mass. at 837-838. The insured was awarded as damages legal fees expended in defending itself over the course of six years. See <u>id</u>. at 838. Although the breach occurred in 1976 when the insurer notified the insured that it would not defend, the court noted that the insurer had no duty to pay until the insured forwarded its bills to the insurer, the bulk of which were submitted after the action was lodged in 1980. See <u>id</u>. at 838, 841-842. Thus, the court determined that the insured would have received a windfall from receiving prejudgment interest from a time before the insurer had a duty to pay. See <u>id</u>. at 841-842. The issue was not whether the insured was "out of pocket" but rather when the insurer's duty to pay arose.

Here, by contrast, the plaintiff had a duty to pay at the time of the planned dental implant surgery, following the teeth extraction in August 2017.[24]  Additionally, the balance of equities, see USM Corp., 392 Mass. at 350, was consistent with the award of prejudgment interest to the defendant.  The plaintiff committed a breach of his promise to pay for the defendant to undergo dental implant surgery.[25]  Relying on that promise, the defendant had her upper teeth extracted.  At the time the parties separated, the defendant had not completed the second part of the procedure, where she would receive implants to replace her extracted teeth.  The plaintiff was left with two options:  pay for the procedure herself and risk an out-of-pocket loss of over $42,000, or go without the dental implants.  That the defendant chose the latter when faced with this dilemma because she could not afford the procedure on her own "should not devolve to [the plaintiff's] benefit when [his breach]

---

[24] Although there was no evidence as to how soon after the first surgery the second surgery was to take place, there was evidence that the entire procedure was to be completed, at the latest, by the time of the wedding but that the defendant did not have the surgery done because she could not afford it.

[25] The plaintiff has not challenged the trial judge's finding on this point.  See Rhode Island Hosp. Trust Nat'l Bank v. Varadian, 419 Mass. 841, 849 (1995) ("When a promise is enforceable in whole or in part by virtue of reliance, it is a 'contract,' and it is enforceable pursuant to a 'traditional contract theory' antedating the modern doctrine of consideration" [citation omitted]).

caused the necessity of legal action and the damages." Siegel v. Berkshire Life Ins. Co., 70 Mass. App. Ct. 318, 323 (2007).

Because the plaintiff withheld from the defendant funds for the dental implant surgery, the plaintiff unlawfully detained money (as it rightfully belonged to the defendant) and the defendant suffered the loss of use of money (to pay for dental implant surgery). Consistent with the purpose of G. L. c. 231, § 6C, the defendant is entitled to prejudgment interest. See Sterilite Corp., 397 Mass. at 841 ("An award of interest is made 'so that a person wrongfully deprived of the use of money should be made whole for [their] loss'" [citation omitted]).

Although the award of prejudgment interest was appropriate, we conclude that it was improperly calculated. According to the judgment, prejudgment interest accrued on the defendant's counterclaim from the date that the plaintiff filed his complaint in the Superior Court, January 16, 2018. Since the judge made no finding on when the plaintiff breached the agreement to pay for the defendant's dental surgery, prejudgment interest should have accrued from the date that the defendant filed her counterclaim, August 23, 2018. See G. L. c. 231, § 6C. See also Deerskin Trading Post, Inc. v. Spencer Press, Inc., 398 Mass. 118, 125-126 (1986). For that reason, the award of $20,999.50 in prejudgment interest is vacated and the matter

is remanded to calculate prejudgment interest from the date that the defendant filed her counterclaim.

3. <u>Conclusion</u>.  We reverse so much of the judgment awarding the engagement ring and wedding band at issue to the defendant, and judgment shall enter for the plaintiff on that count.  We vacate so much of the judgment awarding prejudgment interest.  In all other respects, the judgment is affirmed.  The matter is remanded for recalculation of prejudgment interest and entry of an amended judgment consistent with this opinion.

<u>So ordered.</u>

MILKEY, J. (dissenting in part). I agree with the majority that under existing Massachusetts case law, an engagement ring is viewed as a conditional gift. See De Cicco v. Barker, 339 Mass. 457, 458 (1959). I further agree that a donor of an engagement ring can reclaim it if the donor is not at fault for terminating the engagement. See id. Because I disagree with the particular manner in which the majority addresses the fault issue here, I respectfully dissent. However, I additionally note my view that this case presents an opportune moment for the Supreme Judicial Court to revisit the existing case law.

Where a plaintiff's right to prevail turns on whether the plaintiff was at fault, resolving such fault issues involves questions of fact. See O'Sullivan v. Shaw, 431 Mass. 201, 209 n.3 (2000) (extent to which plaintiff in tort action bore contributory fault was "question of fact properly reserved for the trier of fact"). That principle applies to amatory matters as well, if fault is at issue. See, e.g., Leavitt v. Leavitt, 229 Mass. 196, 199-200 (1918) (because appellate court "cannot reverse [trial judge's] finding of facts," affirming dismissal of fault-based divorce action where judge had found that husband consented to wife's improprieties by giving her money to buy skirt while knowing that she had "adulterous disposition" and

was planning on visiting another man with whom she had "undue and censurable familiarity").[1]

Were I the fact finder here, I would not have found the plaintiff at fault for terminating the parties' engagement. After all, although his suspicion that his fiancée was having an affair proved incorrect (according to the unreviewable credibility findings made by the judge), the plaintiff had what I consider an objectively reasonable basis for forming such a belief. And, in any event, after the flurry of accusations and heated responses on both sides caused the relationship to unravel, I do not believe that the plaintiff can be blamed for reaching the eminently reasonable conclusion that this marriage was not destined to be. In this respect, my own views are closely aligned with those of the majority.[2]

---

[1] There is a dearth of recent cases addressing fault in the context of amatory matters for reasons that are easy to explain. The enactment of the no-fault divorce statute in 1975 generally removed fault issues from having to be resolved in divorce actions. See G. L. c. 208, § 1, inserted by St. 1975, c. 698, § 1 (adding "irretrievable breakdown of the marriage" as ground for divorce). As to the lack of cases dealing with failed engagements, a context seemingly ripe for acrimonious litigation, the enactment of the so-called Heart Balm Act in 1938 generally precluded the party who claimed to have been "wrong[ed]" by the other from suing for breach of the contract to marry. See De Cicco, 339 Mass. at 458-459.

[2] And I certainly agree with the majority that a party is not at fault simply because that party is the one who called off the engagement.

But I am not the fact finder, and the trial judge found the plaintiff at fault after hearing testimony from all involved. I do not think that finding fairly can be said to be clearly erroneous on this record. Cf. Mitchell v. Mitchell, 312 Mass. 165, 170 (1942) ("The decision of the judge who heard the divorce case on a question of fact should stand even if some other judge, upon evidence heard by him, decides that question differently"). That is because it was not unreasonable for the judge to assign fault to someone who wrongly accused his fiancée of infidelity after going through her text messages and listening to her voicemail without permission. Therefore, under existing case law, I believe we are constrained to affirm the judgment in so far as it ordered that the defendant gets to keep the engagement ring that the plaintiff had given to her.[3] See Pointer v. Castellani, 455 Mass. 537, 539 (2009) ("Where there are two permissible views of the evidence, the factfinder's

---

[3] I agree with the majority that both wedding bands -- which the plaintiff paid for but ended up in the defendant's possession -- should be returned to the plaintiff, albeit for a somewhat different reason. At the point the engagement unraveled, the wedding bands may have been "given" to the defendant in the limited sense that they were then in her possession to hold for the upcoming wedding, but they had not been "gifted" to her. Prior to the exchange of wedding bands at a wedding ceremony, such rings by their nature are neither conditional gifts, nor unconditional gifts. There is simply no basis for the judge to rule that the defendant gets to keep the ring that was to be presented to her at a wedding that never took place.

choice between them cannot be clearly erroneous" [citation omitted]).  The majority has avoided that result only by effectively moving to a no-fault standard, all while acknowledging that we, as an intermediate appellate court, lack the authority to do so.  I therefore respectfully dissent.[4]

That said, I question the propriety of trying to get to the bottom of such fault issues in the context of failed engagements.  Although the reasons for that are largely self-evident in this era of no-fault divorces, the majority itself has well explained the problematic nature of trying to assign fault in a case such as this.  Simply put, there is an inherent unseemliness to having judges, or juries, sitting in judgment of matters of the heart.  Obviating the need for such inquiry is presumably one of the principal reasons behind the enactment of the Heart Balm Act, G. L. c. 207, § 47A.  De Cicco ruled that suits to recover engagement rings stand as an exception to the otherwise broad reach of that statute.  As the plaintiff here has suggested, the current appeal may present a propitious

---

[4] The majority reads the judge as saying that the plaintiff must be at fault only because the defendant was not.  Putting aside whether a fault-based scheme in fact presupposes that at least one party must be at fault should a relationship fail, I do not read the judge's findings and rulings so narrowly.  But even if the judge relied on an erroneous view of the law, then we should be remanding, not reversing, on that issue unless we could say that the plaintiff was not at fault as a matter of law.  I do not believe we can or do say that.

opportunity for the Supreme Judicial Court to revisit whether <u>De Cicco</u> should still stand, or whether -- now over six decades later -- its reasoning needs to be revisited.

To be clear, I disagree with the plaintiff's apparent assumption that he necessarily would prevail if the existing case law were modified to omit fault from the calculus. If the Supreme Judicial Court chooses to reexamine the fault issue in light of changing social norms, it may also wish to revisit the premise that an engagement ring is a conditional gift that its donor can sue to recover even in the face of the Heart Balm Act. See <u>De Cicco</u>, 339 Mass. at 459. While there is at least some force to the plaintiff's argument that applying notions of fault in this context is grounded in outdated, sexist norms, a similar argument can be forged with respect to viewing engagement rings as conditional gifts. See Tushnet, Rules of Engagement, 107 Yale L.J. 2583, 2607-2608 (1998).[5] Perhaps it is time to view a gift of jewelry as indeed a gift, and not, in effect, as security for the wedding.[6]

---

[5] In the note, the author argued that the increasingly popular approach of treating engagement gifts as no-fault conditional gifts is founded on the "stereotypes of scheming lower-class vixens" and "prevent[s] certain kinds of injuries suffered mainly by women from being recognized in court."

[6] Even if the reasoning in <u>De Cicco</u> were abandoned with respect to engagement rings, it may still be appropriate to recognize other types of transfers made in contemplation of marriage as implied conditional gifts. For example, prewedding

None of this is to say that I think the defendant here should have kept the ring. To the contrary, my own view is that she should have given it back. But why should my personal view on this issue matter? To me, the ultimate question this case poses is whether such issues should be resolved in courts of law, or instead left to the interplay between private conscience and social norms.

---

gifts intended for joint use by the couple after the wedding may warrant different treatment.